(No. 14468.—Reversed and remanded.)

NANCY STEPHENS *vs.* EMMA B. COLLISON *et al.* Appellants.—(JOSEPHUS W. MARTIN, Appellee.)

*Opinion filed October 28, 1924.*

1. SPECIFIC PERFORMANCE—*when a cross-complainant seeking to enforce parol agreement cannot testify as to improvements.* In a suit among heirs for partition, a cross-complainant who seeks to enforce an alleged parol agreement between himself and the ancestor for a conveyance of the property to him cannot testify as to transactions or conversations with the ancestor in regard to paying for improvements on the property.

2. SAME—*a parol contract for conveyance must be certain and unequivocal.* A parol contract for the conveyance of real estate will not be specifically enforced in a court of equity unless it appears to be certain, definite and unequivocal in its terms, and the proof upon which the conveyance is asked must be so convincing as to leave no reasonable doubt in the mind of the court.

3. SAME—*what proof of performance is required to take contract out of Statute of Frauds.* To take a parol promise for a conveyance out of the Statute of Frauds because of part performance the proof must be clear and convincing that the promisee went into possession under the contract and made valuable improvements with his own means upon the faith of the promise and with the knowledge of the promisor, and all acts performed must refer exclusively to the contract and must be such as to put the party performing them in such a situation that it would be a fraud upon him not to let the agreement be fully performed.

4. SAME—*an oral promise of a father to convey to son must be clearly proved.* An oral promise of a father to convey land to his son if he would live upon it must be very clearly proved to justify enforcing the promise by cross-bill in a partition suit several years after the father's death.

APPEAL from the Circuit Court of Ford county; the Hon. STEVENS R. BAKER, Judge, presiding.

SCHNEIDER & SCHNEIDER, for appellants.

DOBBINS & DOBBINS, and FRANK M. THOMPSON, for appellee.

Mr. CHIEF JUSTICE DUNCAN delivered the opinion of the court:

Josephus Martin, of Paxton, Illinois, in his lifetime owned 1600 or 1700 acres of land in Champaign county. He was also possessed of personal property of the value of $50,000 or more. Previous to his death he had attempted to dispose of all of his property by will and by deeds to be delivered after his death. His first wife, who was the mother of his children, died about 1894. He later married his second wife, with whom he made an ante-nuptial contract, and in his will he specifically provided, in substance, that this ante-nuptial contract be carried out by his executors, and that she was to have all that was given her by that contract except what she had waived by agreement and had joined him in a conveyance of the same, and that she was to have nothing more. He died January 6, 1909, leaving surviving him his second wife, Hannah J. Martin, his widow; Josephus W. Martin, his only son, herein referred to as Joe Martin; Emma B. Collison, intermarried with Fred E. Collison, Mary E. Collison, intermarried with Harry Collison, and Nancy Stephens, his daughters; and Effie Ireland, Walter Karr, Edna Duncan and Charles Karr, children of Dora Karr, his deceased daughter, who had intermarried with G. W. Karr, as his only heirs-at-law. His

will, in which he named his sons-in-law Fred Collison and
G. W. Karr as executors, was executed June 11, 1906, and
was probated in Ford county on February 1, 1909. The
executors named in the will qualified as such and under-
took the administration of the estate.

On January 24, 1910, Nancy Stephens filed a bill in
chancery in the circuit court of Ford county to set aside a
certain agreement and lease made between her and the ex-
ecutors of the will of her father, Josephus Martin, and his
heirs and other devisees; to contest the will of Josephus
and set aside certain deeds made by him to his other chil-
dren and to his grandchildren in his lifetime; and to par-
tition the lands of the testator and grantor among his heirs.
The court sustained certain demurrers to her bill and dis-
missed it for want of equity. On appeal this court reversed
the decree and remanded the cause, with directions to over-
rule the demurrers. (*Stephens* v. *Collison,* 249 Ill. 225.)
The cause was re-instated in the lower court and Nancy
Stephens amended her bill. On a hearing of the cause the
court dismissed the amended bill for want of equity. The
second decree of the court was reviewed by this court on
appeal and reversed for error in excluding certain testimony.
(*Stephens* v. *Collison,* 256 Ill. 238.) On remandment of
the cause the executors of the deceased testator filed a peti-
tion in the lower court asking for authority to settle the
controversies among the heirs and devisees according to a
proposition made by Nancy Stephens. Joe Martin, son of
the testator, filed objections to this proposed settlement.
The court overruled his objections and entered a decree di-
recting the executors to accept the proposed settlement and
ordered conveyances in accordance with the terms thereof.
This court reviewed that decree on a writ of error prose-
cuted by Joe Martin, held that the will gave no authority
to the executors or to the court to authorize or order the
compromise and settlement, and reversed the decree and
remanded the cause. (*Stephens* v. *Collison,* 274 Ill. 389.)

We refer to all of the foregoing decisions of this court, and particularly to the first and second, for full statements of the facts in controversy at those times.

After the third remandment of the cause by this court the remanding order was filed in the cause in the circuit court by Joe Martin, and on April 27, 1917, he filed a cross-bill. On July 7, 1920, after his evidence was partly taken, he filed an amendment to his cross-bill. To the cross-bill as amended he made defendants Emma B. Collison, (now Emma B. Tucker,) Mary E. Collison, Walter Karr, Edna Duncan, Charles Karr, G. W. Karr, as executor of the will of Josephus Martin, Dora B. Ireland, a minor and sole heir of Effie Ireland, deceased, and Lee J. Ireland, surviving husband of Effie Ireland and guardian and guardian *ad litem* of Dora. Fred E. Collison and the testator's widow died pending the litigation in this court. The prayer of the cross-bill is for the specific performance of a certain contract between Josephus Martin and Joe Martin, alleged to have been made several years prior to September 24, 1902, while Joe was employed in the stock yards at Chicago,—an occupation very objectionable to his father and mother, who were then living. The cross-bill alleges that the contract was to the effect that if Joe would give up his home and occupation in Chicago and would remove to the home farm of Josephus and reside thereon, cultivate, drain and improve the same as his own and become a farmer, he (Josephus) would deed the home farm in fee to Joe, containing about 408 acres and located in the town of Kerr, county of Champaign, Illinois. Three other alternate reliefs were prayed in the event that specific performance of the contract was not decreed: First, that a certain deed alleged to have been prepared and signed by Josephus and wife to Joe on or about the second day of October, 1902, conveying in fee the premises described as the home farm, may be restored and held to have been delivered and in full force, which the cross-bill alleged was placed in the hands of Fred Collison

for delivery, together with other deeds of similar character and of the same date prepared and signed by Josephus and wife, one to Emma B. Collison for 320 acres, one to Mary E. Collison for 339.20 acres, one to Effie Karr, (later Effie Ireland,) Walter Karr, Charles Karr and Edna Karr (now Edna Duncan) conveying to them 249 acres, and one to Nancy Stephens conveying certain other land. Second, that the deeds to Emma B. Collison, Mary E. Collison and the four Karr children, executed in October, 1902, may be canceled and held for naught; also that a deed executed June 11, 1906, by Josephus and wife to Joe for his natural life, etc., may be canceled. Third, that the last mentioned deed to Joe for life, etc., may be corrected and construed to convey to Joe a fee simple title to the premises therein described, that the provisions therein with reference to the grantees of the remainder be canceled and held for naught, and for other relief. Among other things it was alleged in the cross-bill that Josephus was on June 11, 1906, of unsound mind and not of disposing memory, was in his dotage and in ill-health, and was incapable of making any just and proper distribution of his estate or of making voluntary deeds of conveyance of his property, especially where he was subjected to the undue influence and control of those in whom he had reposed confidence. It was further alleged, in substance, that a confidential relation existed between him and his son-in-law Fred Collison, who was a brother of Harry Collison; that Fred Collison took advantage of this confidential relation for the purpose of getting the best part of the estate of Josephus to be conveyed and willed to Fred's wife and his brother's wife; that by undue influence he caused Josephus and his wife, on June 11, 1906, to execute the deed to Joe conveying to him only a life estate and caused him to dispose of the remainder in fee so that it would ultimately go to Emma B. Collison, his wife, Mary E. Collison and the four Karr children; that he caused him to execute the will disposing of the remainder of his

property not already conveyed, in a manner favorable to Emma B. and Mary E. Collison; that he caused the former deed executed by Josephus and wife in October, 1902, to Joe in fee to not be delivered, as his father had intended it to be; that it was at all times the intention of Josephus to convey to Joe the home farm in fee and to dispose of the remainder of his real property equally among his other children and grandchildren up to and until the date aforesaid, when he was unduly influenced by Fred Collison.

On the final hearing the court decreed specific performance of the alleged contract between Josephus Martin and Joe Martin as prayed in the cross-bill and canceled all the provisions in the deed conveying to Joe a life estate, in so far as the same purported to convey any interest in the home farm of the deceased to the heirs of the body of Joe, or to Mary E. Collison, Emma B. Collison or the four Karr children, as a cloud on his title. The court specifically found that inasmuch as it had decreed specific performance of the alleged contract and had set aside all parts of the deed which were inconsistent with the contract that Joe was to have a deed in fee, it was unnecessary for it to determine whether the deed was secured by undue influence or whether Josephus was at the time of the execution of the same of sufficiently sound mind and memory to execute the same, or whether or not Fred Collison occupied a fiduciary relation to Josephus on the day when the deed and will were executed, and also that it was immaterial what construction should be given to the deed to Joe purporting to convey to him a life estate, only. All the cross-defendants have appealed from the decree of the court.

The answer of appellants made specific denial of the contract set forth in the cross-bill. It also set up the Statute of Frauds as a defense. Whatever contract or promise Josephus Martin made to Joe Martin with reference to contracting or giving him the home farm rests entirely in parol. There is no claim or pretense that the contract or

promise was in writing, and, so far as the record shows, no one other than the two parties to the contract or interested in the promise was present when such alleged contract or promise was made, therefore no witness knows better what the contract or promise was than Joe. His testimony in the record concerning this contract or promise is in substance as follows: His father told him to go on the farm; that "the farm is going to be yours; all I want you to do is to bring me up a load of hay and a load of corn once in a while and you can have the rest of it." He further testified that his father told him that the farm was the place for him; that he was going to give him the farm; that he told him that the farm was his, and that he could make lots more money on the farm than in Chicago. The witness then testified: "I told him I would go to the farm; I did so; it was before my mother's death; I afterwards moved on the farm and stayed on the farm from that time on."

The other testimony in the record on the part of the co-plaintiff with reference to the contract is testimony as to oral declarations made by the deceased in his lifetime. There were very few of such witnesses, and the testimony of the three principal ones bearing on this contract or promise we give in full so far as it pertains directly to the subject. The witness Benjamin testified in these words: "He [Josephus Martin] talked to me about Joe being in Chicago. He said Joe went away from home and went to Chicago and went in the stock yards. He said he was an only son and he felt bad about it,—about his being up there in that dirty place. He went after him and told Joe if he would go home and go on the farm and stay on the farm he would give him the farm. He said, 'Don't you think Josephus Martin is a man of his word?' I said, 'Yes; of course, I do.' 'Well,' he says, 'Joe Martin kept his contract with me on that and I didn't keep mine.' That was about 1905 or 1906. He did not say how he failed to keep his contract." This witness later testified: "He said Joe did come home

and went on the farm and stayed on the farm, and he said, 'I did not do what I agreed with him.' That was along about 1906 or 1905. Martin lived five years after that." According to this witness' last statement his conversation with Josephus took place in 1904,—about two years before Josephus made the deed to Joe conveying to him the home farm for life.

Charles Wood testified in these words: "Never heard any conversation between Joe Martin and Josephus Martin with reference to any arrangements made to have Joe return to the farm. I remember Joe coming back to the farm from Chicago. He conducted it until he moved here to Paxton. Joe moved to Paxton since his father's death. Up to that time he lived down on the home place. He was not married when he first lived there. He married four or five years after he moved on the farm. He conducted and managed it. Never heard any talk between Joe Martin and his father in regard to how he conducted the farm." The witness later testified in these words: "He [Josephus Martin] told me that farm [the home farm] was Joe's. He said he gave it to him. He said he told Joe, when he was in Chicago, if he would come back and stay there he would give him that farm if he behaved himself. I remember that the house which was on the farm burned. Josephus Martin made the remark to me that Joe's house had burned down and he didn't have no money to build with and said he gave him that farm and now he was broke."

Frank Wesslund testified for the cross-complainant, in substance, that Josephus Martin told him in a conversation that Joe had failed down there (on the farm) and hadn't turned out very well. He further stated that Josephus said that Joe didn't tend to business any more, and that he had made up his mind that he was going to fix the matter so that Joe could have the farm for his lifetime, and that he was going to fix it so he wouldn't do whatever he wanted to do with it when Josephus was dead and gone.

There is no testimony in the record that makes out a stronger or better case for Joe Martin than the testimony we have above set forth. His sister Nancy Stephens testified, in substance, that she remembers about Joe being in Chicago at the time he worked at the stock yards and that she had a conversation with her father about Joe in Chicago. Her father told her that it was killing his mother to have him away from home and that he wanted him to come back. She testified that this was all she ever heard him say about Joe going home. She positively testified that she did not hear any statements made by her father with reference to any agreement to convey Joe any land. She did state that Joe worked in the stock yards at that time and that he did come back and go onto the home farm. The conversation between her and her father occurred at her home in Chicago, but she could not fix the date of the conversation. From all the evidence in the record this must have taken place about two years before her mother's death, or in 1892, or before that.

The decided weight of the evidence is against the contention of Joe Martin that he paid the taxes on the farm before his father's death and made lasting and valuable improvements on the farm before his father's death and while he occupied it. He did testify that he paid the taxes on the farm and paid no rent to his father, and that he made the improvements on the farm, except the house that was built on it while he was there, which cost $2000 or $3000. The old house on the farm had burned, and in regard to the new house that was built he simply stated that he worked on it while it was being built and that his father paid all other costs of the house. In another part of his testimony he stated that his father told him that if he would put into the building of the house the $1000 insurance money that Joe had collected on the house, and help do the work and board the men, his father would do the rest of the building of the house. He nowhere states that he did furnish the in-

surance money or that he boarded the men. Besides, his testimony in regard to improvements was objected to by appellants on the ground that he was an incompetent witness, and he was clearly incompetent to testify as to these matters.

The testimony in the record does show that while Joe Martin was residing on the premises the house burned, and that his father made the contract with the contractor to rebuild the house that was built after the old house had burned and paid him with his own check for the building of it. The competent testimony in the record shows that there was a corn-crib built on the premises and that there was some tiling done on the farm, but there is no competent testimony in the record that Joe made any of the improvements on the farm or paid for any of them. The positive competent testimony in the record is that he did not do the tiling on the farm. He was also positively contradicted in his testimony that he did not pay rent to his father while he was on the farm. His own testimony on that matter is contradictory. Besides, it was positively proved that he testified in a case of Hannah Martin, his step-mother, against Fred Collison and others, that he did pay rent for ten years prior to his father's death but that he did not know how much. He further testified that during one year he paid $1000 as rent for about 400 acres. When asked to tell what rent he agreed to pay his father, his answer was this: "I kept no account of it; we made our own settlements; never thought it anybody's business; we came out all right; don't remember how much I paid him."

The evidence in the record does not warrant the specific performance of the oral contract or promise of Josephus Martin to convey the land in question to Joe Martin. The contract, in the first place, was not proved as alleged. The court, perhaps, was warranted in the conclusion that the father, in order to induce his son to quit his employment in Chicago, had some kind of an understanding with him that

if he would go on the home farm and farm it the farm would ultimately become his own. Even if there was a positive promise that he would give him the farm if he would quit his employment and go on the farm and work and farm it, the facts proved in the record do not warrant the enforcement of this promise, as the Statute of Frauds is a complete defense. It is the well settled law of this State that a parol contract for the conveyance of real estate will not be specifically enforced in a court of equity unless it appears to be certain, definite and unequivocal in its terms. (*Lonergan* v. *Daily,* 266 Ill. 189.) To take such a promise out of the Statute of Frauds on account of part performance, all acts performed thereunder must be clear and definite and referable exclusively to the contract. The proof upon which the conveyance is asked must be established so convincingly as will leave no reasonable doubt in the mind of the court. (*Langston* v. *Bates,* 84 Ill. 524; *Patterson* v. *Patterson,* 251 id. 153.) The proof must establish a definite and unequivocal contract, and it must be clear and convincing that the promisee went into possession under the contract and made valuable improvements upon the property with his own means and upon the faith of the promise and with the knowledge of the promisor. Clearer proof is required when the alleged contract is between father and son. (*Richardson* v. *Lander,* 267 Ill. 181; *Ranson* v. *Ranson,* 233 id. 369.) To take an oral promise, which has been partly performed, out of the Statute of Frauds the part performance must be such as to put the party in such situation that it would be a fraud upon him not to let the agreement be fully performed. *Weir* v. *Weir,* 287 Ill. 495.

Appellants make the contention that the cross-bill should have been dismissed because it was filed after Nancy Stephens, the original complainant, had dismissed her bill. The dismissal of her bill was in the compromise proceedings at a previous term of the court before the cross-bill was filed and was in pursuance of the compromise between the par-

ties which was ordered to be carried out by the lower court. The decree in the compromise proceedings was reversed by this court and the cause remanded, and on remandment the cause was re-instated at the instance of Joe Martin. After the re-instatement of the cause the bill of Nancy Stephens stood pending for a further trial, and as there was never any dismissal of her bill after that time and before the cross-bill was filed, the contention of appellants can not be sustained that the cross-bill was improperly filed because of the dismissal of the original bill.

Other questions are raised on the record and discussed by both parties in their briefs, but we deem it improper to pass on any of them at this time because of the fact that the decree of the court in this case must be reversed without regard to any of the other questions that have been raised. We also deem it improper for this court to pass upon the other questions presented by this record for further and other relief, inasmuch as the court expressly declined to pass on them and on other facts necessary to determine whether or not the cross-complainant was entitled to any other relief prayed for in his bill. For us to do so would place us in the position of a trial court and not a reviewing court. In other words, there is nothing further for us to review, as the court has declined to pass upon all other questions in the record touching the right of the complainant in the cross-bill to have other and further relief than that granted by its decree.

For the foregoing reasons the decree of the circuit court is reversed and the cause is remanded for the consideration of the other questions in the record not passed on by the court.

*Reversed and remanded.*