NANCY STEPHENS *vs.* EMMA B. COLLISON *et al.* Appellees.—(JOSEPHUS W. MARTIN, Appellant.)

*Opinion filed April 21, 1928.*

1. DEEDS—*when there is no presumption of existence or delivery of alleged lost deed.* The facts that a grantor executed three deeds conveying fee simple titles to certain of his children on a certain date and four years thereafter executed a deed to complainant, another child, conveying only a life estate, all four deeds being recorded the day after complainant's deed was executed, do not give rise to the presumption that the complainant likewise was given a fee at the time the deeds to the other children were executed, that such deed, with the others, was at that time unconditionally delivered in escrow to the party who afterwards recorded the later deed conveying to complainant a life estate, and that the alleged deed conveying a fee was unlawfully re-possessed or destroyed, where there is no evidence of the existence of any previous deed to complainant and where the existence of such a deed is denied. (*Hudson* v. *Hudson*, 287 Ill. 286, distinguished.)

2. SAME—*presumption is against unlawful destruction of deed.* It is a fundamental maxim growing out of experience, sound morals and of public policy, that every presumption will be indulged against unlawful acts, including the wrongful destruction of deeds and other legal conveyances.

3. SAME—*there is no presumption as to grantor's intention in disposing of property.* The presumption that a testator intended to dispose of all his property does not apply to a grantor, and in a conveyance by deed there is no presumption as to disposition of property other than that expressed in the deed or deeds proved to have been made and delivered.

4. SAME—*complainant must clearly prove existence of alleged lost deed.* A party seeking to establish the existence and contents of an alleged lost deed by parol testimony must bear the burden of making such proof in a clear and conclusive manner, as deeds are evidence of title and public policy demands that if they be lost proof of their former existence and contents should be strong and conclusive before the court will establish title by parol testimony.

5. SAME—*what necessary to establish a lost deed by parol testimony.* Where parol proof of the existence and contents of a lost deed is offered as the only evidence thereof, the witness must have seen and read it and be able to speak pointedly and clearly as to

its tenor and contents and to state whether it conveyed a life estate or a term of years and whether it was, in fact, executed by the supposed grantor.

6. SAME—*what is not an invalid attempt to create a remainder after a fee.* A conveyance to a grantee for life with remainder to the legitimate heirs of his body, with a provision that in case he dies leaving no heirs of his body the fee shall go to other parties, is not an invalid attempt to create a fee after a remainder in fee, but the condition of survival of the heirs is a proper limitation where it is a conditional feature of the granting clause.

APPEAL from the Circuit Court of Ford county; the Hon. STEVENS R. BAKER, Judge, presiding.

DOBBINS & DOBBINS, for appellant.

SCHNEIDER & SCHNEIDER, (R. L. SCHNEIDER, guardian *ad litem,*) for appellees.

Mr. COMMISSIONER CROW reported this opinion:

This is the fifth time this cause has come to this court for review. Each previous case is reported as *Stephens* v. *Collison.* The respective decisions are reported in 249 Ill. 225, 256 id. 238, 274 id. 389, and 313 id. 365. We refer to the preceding decisions for a full statement of the facts in controversy at those times. After the cause was remanded the third time, Josephus W. Martin filed an amendment to his cross-bill. Upon a hearing on the issues made and evidence taken a decree was rendered in his favor, and this court reversed it. The decree rendered in the instant case was upon his cross-bill as amended July 7, 1920, which was part of the record in the case last reported. Upon the last hearing, without additional evidence, the circuit court dismissed the cross-bill for want of equity, and cross-complainant has appealed to this court.

The original and amended bills and answers are not set out in the abstract. The amendment to the cross-bill filed July 7, 1920, is abstracted. The questions for decision on this appeal, in view of the last decision, will be more clearly

330—4

presented by stating the amendment as abstracted substantially at large. Cross-complainant, for brevity, is designated as complainant.

The only bill contained in the abstract of the record is paragraph 4 to the conclusion of the cross-bill as amended July 7, 1920. Substantially it avers that several years prior to September 24, 1902, complainant was residing in the city of Chicago, where he was then employed, and his father, Josephus Martin, was the owner of the premises known as his home farm; that he was extremely anxious that complainant, his only son, should occupy, cultivate, drain and improve the farm, in order that it might be carefully maintained and that complainant might reside near him; that he was very much averse to complainant residing in Chicago and being engaged in other business than that of farming, and, with the above ends in view, he proposed to complainant that if he would give up his home, occupation and position in Chicago and remove to the home farm and reside thereon and cultivate and care for it as he would his own farm and become a farmer instead of following the occupation which he then followed in Chicago, he would deed to him the tract of land described, meaning and intending that he would convey to complainant the title to said premises in fee simple in consideration of the acts required on the part of complainant; that thereupon, in consideration of the promises on the part of Josephus, complainant did give up his home and occupation in Chicago and with his family removed to and established himself upon the farm as a farmer and proceeded to cultivate, drain, manage and improve it the same as he would were it his own, relying upon the promises of his father; that on October 2, 1902, Josephus caused to be prepared and signed by himself and wife several conveyances, in and by which he undertook to convey portions of other premises which he then owned to Emma B. Collison and Mary Elizabeth Collison, his daughters, and to Effie Karr, (now Effie

Ireland,) Walter Karr, Charles Karr and Edna Karr, (now Edna Duncan,) certain real estate described in each of the deeds, copies of which were attached to the original bill filed by Nancy Stephens in this cause on June 24, 1910, and marked Exhibits A, B and C, and which deeds are made a part hereof, reference thereto being had for greater certainty; that at the time said deeds were made complainant was informed and believed that Josephus, as part of the same act, did have prepared and signed by himself and wife another deed conveying certain premises to his daughter Nancy Stephens, and that as a part of the same act, and at the same time, he caused to be prepared and signed by himself and wife a warranty deed in the same form as the deeds referred to as Exhibits A, B and C, which conveyed to complainant the home premises; that all of said deeds were executed in the same manner, and if one of said deeds was delivered then all of them were delivered at one and the same time; that all of the deeds were left in the possession of Fred Collison with the same direction with reference to their delivery, and that if said deeds referred to as Exhibits A, B and C have become delivered and effective then the deed to complainant became effective with the deeds referred to as Exhibits A, B and C and conveyed to complainant the home farm, and which deeds, and each and all of them, were left by him in the possession of his son-in-law, Collison, and, so far as complainant can ascertain, there was no distinction or difference in the manner or directions by which said deeds were left with Collison at the time they were signed by Josephus on October 2, 1902; that on June 11, 1906, Collison was engaged in the banking business in Rantoul; that he is a brother of Harry Collison, then deceased, who had theretofore intermarried with Mary Elizabeth Collison and was then her brother-in-law both by the marriage of his brother to her and by the fact that she is a sister of the wife of Collison; that Collison then understood that the wife of complainant had undergone an

operation which he believed rendered her incapable of giving birth to children; that he contrived and designed to so manipulate the conveyances made by Josephus that the wives of himself and his brother would obtain all of the estate of complainant at complainant's death and the wife of complainant be deprived of any interest therein; that he was then acting as the agent and business adviser of Josephus, who reposed great confidence in him; that Collison, because of his confidential relations with Josephus, was familiar with all of the business transactions, conveyances and testamentary dispositions which Josephus had theretofore made of his property and was able to control and direct him because of his physical and mental condition on June 11, 1906; that Josephus on said day was, as complainant avers, not of sound mind and memory and not of disposing mind, but, on the contrary, was in his dotage, in ill-health, and his body and mind were so diseased and his memory so impaired as to render him incapable of making any just and proper distribution of his estate or of making voluntary deeds or conveyances of his property, especially where he was subject to the influence and control of those in whom he had theretofore reposed confidence and with whom he had entrusted the management of his business; that it was not his desire or intent on said date to give complainant a life estate, only, in said property in any conveyance conveying property to complainant, but that it was his wish and intention, and always had been his intention, to deed said premises to complainant in fee simple in compliance with his contract and his long-sustained desire as to the distribution of his property; that he had always theretofore intended that his property should be divided among his children in approximately equal proportions, and that complainant should receive the home farm and the children of Dora Karr should take their mother's portion of said estate; that Collison having in his possession the deeds theretofore drawn and signed by Josephus, and designing

and intending to obtain an advantage for his wife and his brother's wife out of the property which Josephus intended and desired to convey to complainant, took advantage of the physical and mental condition of Josephus and by means of his position of confidential adviser and business manager, and by means of undue influence by him then and there exerted over him, induced him to sign and acknowledge another deed on June 11, 1906, in and by which he 'again purported to convey to complainant the home farm but undertook therein to limit the estate of complainant in said premises to a life estate, with a contingent remainder to Emma and Mary Collison if complainant should die leaving no legitimate heirs of his body at the time of his death, and did also induce him to execute a will, in which all of his other property besides the premises described in Exhibits A, B, C and D, including the premises deeded to Nancy Stephens, should largely go to the wife of Collison and his sister-in-law; that by means of undue influence and of his control over Josephus, Exhibit D was made and drawn; that said deed and will were, in fact, the deed of and will of Collison and were not as Josephus desired the same to be when he was in his sound mind and not under any undue restraint and improper influence; that Collison did either conceal or destroy the deed theretofore made by Josephus on October 2, 1902, conveying the home farm to complainant in fee simple and conveying other premises to Nancy Stephens and filed for record on June 11, 1906, the deeds designated as Exhibits A, B, C and D; that Exhibits A, B and C were left with Collison under no other or different arrangements or directions as to the delivery than was the deed conveying the home farm to complainant made on the same date, and that if Exhibits A, B and C were delivered and became effective then said deed conveying the home farm to complainant in fee was effective and conveyed the fee simple therein to complainant, subject to the life estate of Josephus and subject to no other remain-

der whatsoever; that instead of recording the deed convey-
ing the home farm to complainant in fee simple Collison
recorded the deed made to his wife and sister-in-law and to
the heirs of Dora Karr as the same were made on Octo-
ber 2, 1902, and in lieu of the deed made by Josephus to
complainant conveying to him the home farm in fee simple
Collison wrongfully caused to be recorded the deed by him
procured to be made on June 11, 1906, limiting the estate
of complainant in said premises to a life estate; that if
said lost or destroyed deed conveying the home farm to
complainant in fee simple was never delivered, then neither
were Exhibits A, B and C delivered and never became of
any effect, while, on the contrary, if Exhibits A, B and C
were delivered, then the lost or destroyed deed to complain-
ant became effective and conveyed to complainant the prem-
ises in fee simple in accordance with the contract executed
and made by Josephus and performed by complainant; that
the validity of Exhibits A, B, C and D and the validity of
the will have from the time of the death of Josephus to the
present time been in litigation and are now in litigation be-
tween the parties to the original bill; that complainant de-
sires the contract so entered into by Josephus with him for
the conveyance of the home farm and performed on the
part of complainant may be specifically enforced, and that
in case the deeds designated as A, B and C shall be deter-
mined by this court to have been delivered to the grantees
therein, that the heirs of Josephus, or the commissioner of
this court in lieu of said heirs, may be required to convey
to complainant in fee simple the home farm; that the deed
marked Exhibit D and recorded shall be set aside as a cloud
upon the fee simple title of complainant to said premises, or
in the alternative that said deeds A, B, C and D shall be
canceled and set aside and held for naught; that he hereby
offers, if said deeds be set aside, to re-convey any interest
which he acquired by reason of said deed, and if the other
deeds are not set aside or if the contract is not specifically

enforced, then Exhibit D should be so construed by this court as an attempt to limit a fee upon a fee; that the limitation of said premises upon the death of complainant leaving legitimate heirs of his body shall be held by this court to create a fee simple in said premises or a fee tail becoming vested in fee upon the birth of heirs of complainant; that the further provision therein which undertakes to provide that if legitimate heirs of the body of complainant are born and they should die and complainant have no other legitimate heirs born unto him the premises should go to others therein named, should be held to be an attempt to limit a fee after a fee and not in the alternative, and therefore void, and that by reason thereof said deed should be construed as a deed conveying said premises to complainant in fee simple or even in fee tail, and that the limitation over and after said freehold estate should be construed to be of no effect whatever.

Defendants to the cross-bill specifically deny all of its material averments as to fraud and unsoundness of mind of Josephus Martin and many that are immaterial to the decision of the case then and now at bar. They deny the averments of undue influence of Fred Collison and all charges of improper or fraudulent conduct on his part in any of the transactions charged in the cross-bill. They aver that immediately after the death of Josephus, on January 6, 1909, complainant went into possession of the premises described in Exhibit D, which premises complainant in his cross-bill prays may be awarded to him in fee simple, and that he is now, and ever since the death of Josephus has been, in open possession of the same, collecting rents therefrom and in every way performing acts of ownership, wherefore he is estopped from claiming any other title to said land except that given to him by the deed of conveyance from Josephus. As to the alleged contract or agreement between Josephus and complainant that if he would leave Chicago and go upon the farm Josephus would convey

to him, in consideration thereof, the land claimed, defendants charged that it was void under the Statute of Frauds because it was not evidenced by any writing or memorandum signed by the party to be charged. They alleged that if the contract was, in fact, made between Josephus and complainant, then complainant was guilty of *laches* in not asserting his pretended title "long ago," and that any such claim is void under the Statute of Limitations, which defendants plead and claim the benefit of.

The record shows that a warranty deed conveying certain real estate to appellant was executed by Josephus Martin on June 11, 1906. The consideration expressed was one dollar and love and affection. The deed conveyed the property to appellant "during his natural lifetime, then to the legitimate heirs of his body, and in the event of his death without leaving any legitimate living children or descendants of legitimate children, then to Mary Elizabeth Collison an undivided one-third part, to Emma B. Collison an undivided one-third part, and to Effie Karr, Walter Karr, Edna Karr and Charles Karr an undivided one-third part." It recited that it was made and accepted subject to the payment of $2400 to Emma B. Collison on or before two years after the death of the grantor, "reserving, however, the use, possession and absolute control of the said land for and during the natural life of the grantor, Josephus Martin." It was filed for record in the recorder's office of Champaign county on June 12, 1906. On the deed was a notation: "Record and mail to Fred Collison, First National Bank, Rantoul, Illinois.—Fred Collison, president." One of the witnesses testified the notation was in Collison's handwriting.

The only question of fact presented by the cross-bill is, Did Josephus Martin execute a deed conveying to appellant a fee simple title in the home place? It is contended by appellant that he did, but no witness has testified that such a deed was ever executed. The contention is that it was

made at the same time the deeds to grantor's other children were executed, but no one ever saw it, so far as the evidence discloses. The theory of the cross-bill is that it was executed, left with a son-in-law of the grantor, and that afterwards it was destroyed by him and the grantor induced to make the deed conveying a life estate, instead of an estate in fee simple, to appellant. The theory is attempted to be supported by a series of circumstances particularly stated in the cross-bill. It is apparent that the inference of the delivery of a warranty deed cannot be drawn from the facts therein stated. Its making and delivery depend on human volition—the volition of the grantor. There is nothing of the character of natural sequence in the execution of the several deeds. He either made it or did not make it. If he determined to convey to the other three grantees a title by such a deed, and no other deed than that left to complainant was ever found or recorded, no legitimate inference can be drawn that any other deed was made. It is a fundamental maxim growing out of experience, sound morals and public policy, that every presumption will be indulged against unlawful acts, including the wrongful destruction of deeds and other legal conveyances. Such acts, if charged, must be clearly proved. The right asserted by appellant cannot be supported or created by such groundless presumptions. The claimed right, from a consideration of the evidence, rests upon no better basis. The evidence of his right was commented on and held to be insufficient in *Stephens* v. *Collison,* 313 Ill. 365, when the case was last before this court. The circuit court had decreed specific performance as prayed in the cross-bill. The court denied the relief in this case and dismissed the bill for want of equity.

The presumption is that the grantor was of sound mind when he executed the deed in question. Without quoting the testimony of men and women who knew him for many years and dealt with him in a business capacity, it is suffi-

cient to say it abundantly supports the presumption that he was of sound mind and knew all the time what he was doing. When the transactions now attacked were had, he was lending money, calculating and collecting interest thereon, attending to the depositing of his money in banks, and doing everything that a man of his financial worth and standing would or could do. There is no evidence that anyone attended to or looked after his extensive business interests. The evidence shows that his financial affairs, conducted by himself, only, were in perfect condition. His promptness in collecting interest on money lent is mentioned by all of the many witnesses who had borrowed money from him. He entered bank deposits in his bank-books, and they were always found to be correct. He calculated interest on his loans, and it was always found to be accurate. In number of witnesses and testimonial value the evidence in support of his mental capacity to transact all business decidedly preponderates in favor of his soundness of mind and business ability. The chancellor so found and was fully justified therein. The burden of proof in those respects was on appellant, and he did not sustain it.

Appellant left Chicago and went upon the farm at the request of his father. His work at the stock yards was not agreeable to his father's idea of what his occupation should be. The father owned a large quantity of land— about 1700 acres. Appellant was the only son. The father was active for his age but wanted appellant to assist in managing his properties. He told him if he would come home and go on the farm and look after the farming business he would give him the home place. There is no denial of that statement. The only competent evidence in the record as to the conveyance is the deed executed by Josephus to appellant June 11, 1906. It was recorded on June 12, 1906. The will of Josephus was made at the same time. In the will he stated that he had that day made the deed to appellant in which he created what he designated as

a vendor's lien. It was a charge upon the land to secure the payment of $2400 to Emma B. Collison on or before two years after the testator's death. It directed the executors to pay to Mrs. Collison, from the share bequeathed to appellant in the sixth clause of his will, $2400, "or as much thereof as shall be his share, which sum shall be applied toward the discharge of the said vendor's lien." In effect the grantor took care of the charge on the land deeded to appellant.

The whole of appellant's case rests upon the proposition that Josephus Martin made and executed a warranty deed to him on October 2, 1902, conveying without conditions the home farm to him, and that it and deeds of like import executed on the same day were left with Fred Collison, to be delivered to the grantees mentioned in said deeds. The other deeds are designated as Exhibits A, B and C. The property conveyed by those exhibits is not now involved. The argument in the bill amounts to nothing more than that if the first three deeds were made on October 2, 1902, and delivered to Collison, the fourth deed must have been made and delivered; that it was destroyed by Collison or lost, and Exhibit D, dated June 11, 1906, substituted for it; that if the first three deeds conveyed a fee, the fourth must therefore have conveyed the fee to appellant and was afterward changed to a life estate by the deed now in question. Having reached that illogical conclusion, appellant's contention is that on September 24, 1902, Josephus having made a distribution of his property, "the law presumes that he made a full and complete distribution of all of it." *Craw* v. *Craw*, 210 Ill. 246, is cited in support of the conclusion. The fallacy of the contention lies in the difference between a disposition by will and by deed. In the case cited the disposition of the property was by will, and in construing it Mr. Justice Cartwright stated the elementary doctrine as applied to disposition by will. In conveyance by deed there is no presumption as to disposition of property other

than that expressed in the deed or deeds proved to have been made and delivered. In support of the contention as to the making and delivery of the deed *Waters* v. *Lawler,* 297 Ill. 63, is cited. In that case it was shown that the grantor's declarations were sufficient to establish the fact of delivery of the deed in question to the Autens for the grantee, John Megan. The grantor in that case got possession of the deed after its delivery and destroyed it. The evidence does not show that fact in this case nor anything like it. No tangible circumstance is proved that permits the conclusion or suggests it.

It is said the fact that the grantor, with the aid of his son-in-law, re-possessed himself of the deed made to appellant in 1902 and concealed or destroyed it does not operate to divest his title nor prove that the previous delivery was conditional. As matter of law the proposition is sound, but the facts assumed and out of which the law arises have no support in this record. No witness testifies that a deed of the property to appellant was made in 1902. If such a deed was made to him it is not contended that it was made at any other time. The mere fact that other deeds were made at that time is not sufficient to establish the fact that the same sort of deed, or any deed, was made to him. That it was made and left with Collison to be delivered cannot be regarded as established except upon the assumption that either Collison or the grantor afterward destroyed it. *Hudson* v. *Hudson,* 287 Ill. 286, *Gomel* v. *McDaniels,* 269 id. 362, *Tanton* v. *Keller,* 167 id. 129, and many other cases cited by appellant, were decided on facts showing the actual existence of the alleged conveyances. In some of them,— in *Hudson* v. *Hudson* especially,—the effect of the destruction or suppression of such instruments is fully discussed, but in all of them there was evidence of the previous existence of the deeds. That fact being established, their existence must be accounted for by the possessor. In this case the record is barren of any evidence that a deed had

previously been made of the home place. Without encumbering the opinion with reasons for the unsoundness of the inferences drawn from the premises stated in the cross-bill, it is sufficient to say that an inference that the deed to appellant was made does not follow from the premises assumed. The inference that Josephus made a deed to appellant on October 2, 1902, is based on the fact that on that day he conveyed to Emma B. Collison 320 acres of land, to Mary Elizabeth Collison 249 acres and to the Karr children 249 acres; that those deeds were recorded on June 12, 1906; that the deed to appellant was made on June 11, 1906, and recorded June 12, 1906, and that the will was made on June 11, 1906; that therefore a previous deed must have been made to appellant on October 2, 1902, and destroyed on June 11 and the later deed substituted for it. A more obvious *non sequitur* cannot be conceived. The execution of the deed as averred in the cross-bill was denied. Appellant was thereby put upon proof of it. There is no evidence in the record that sustains it.

But it is said that all of the deeds were placed in the hands of Fred Collison for delivery. This alleged transaction, it is contended, constituted the delivery of the alleged previous deed by the grantor, and therefore the second deed is void. But the argument is embarrassed by a serious hiatus. There is an entire absence of proof, or of any legitimate evidence tending to prove, that the deeds executed in 1902 were delivered before June 11 or 12, 1906. It is contended that they were actually delivered to the grantees by the grantor. No one testifies that they were delivered to anyone for the purpose of delivery to the grantees. If the deeds executed on October 2, 1902, are not shown by the evidence to have been handed to Lateer or Collison for the purpose of delivery to the grantees they were not effectual as muniments of title. It is not contended that they were otherwise delivered. Delivery is a fact—as much a fact as the execution of the conveyance.

Without the concurrence of both facts the written documents, though in form conveyances of land, were ineffectual. But if on June 11, 1906, Josephus Martin directed Collison to send the last deed, with the others, for record, they all then became effective. They passed, in contemplation of law, beyond his control, and the title thereby passed to the several grantees even though the deed might have been lost in transit. If a deed was, in fact, executed by Josephus and delivered to Collison for the purpose of delivery to appellant the title passed. But there is no evidence of that fact. As to the envelope delivered to Lateer, the banker with whom Josephus did banking business, all the knowledge of it we have is afforded by his testimony. The circumstance is pressed with vehemence by appellant. Lateer testified that Josephus delivered an envelope to him with instructions to deliver it, in case of his death, to either G. W. Karr or to W. P. Martin. There was an endorsement on the back of the envelope as follows: "Deeds to be delivered to G. W. Karr or W. P. Martin in case of the death of J. O. Martin." What deeds were in it? What did they convey? Why were they delivered to Lateer? No one knows, or at least there is no evidence as to what they were, to whom or by whom made, or what they conveyed. Besides, the direction was to deliver conditionally—upon the death of J. O. Martin. It remained in the bank about two years, when Josephus took it away. The evidence as to the possession of the deed now in question by Collison is no more substantial.

In *Shipley* v. *Shipley,* 274 Ill. 506, Shipley filed a bill to have the title to an eighty-acre farm quieted and declared to be in his name in fee simple. The questions presented by the issues made on the bill were whether the deed alleged to pass the title from the wife to the husband was signed by her, and if signed, whether it was delivered to him. The complainant based his right to relief on the ground that the land was conveyed to him by deed duly signed, acknowl-

edged and delivered but which was destroyed before being recorded. On the questions there presented, so closely analogous to those now at bar, it was held that the evidence regarding the material elements of the alleged lost deed was not sufficiently clear and convincing to sustain the decree. Mr. Justice Carter said: "Appellee does not base his right to relief on a parol agreement for the sale of lands or an interest therein, but on the ground that the land was conveyed to him by deed duly signed, acknowleged and delivered but which was destroyed before being recorded. The burden of proof rested upon appellee to show that the instrument upon which he relies was executed and delivered as required by law. A deed valid to convey real estate must be signed and sealed. * * * It must also be delivered. (*Weber* v. *Christen,* 121 Ill. 91; *Skinner* v. *Baker,* 79 id. 496.) Where a deed has been actually delivered to a grantee in the life of the grantor, even though it contains a provision that it is not to take effect until the grantor's death, it will be sustained as a present grant of a future interest. (*Hathaway* v. *Cook,* 258 Ill. 92.) * * * To constitute a valid delivery of a deed the grantor must absolutely divest himself of control over it, and if he retains custody or control over it in any way there is no valid delivery. A deed must take effect upon its execution and delivery or not at all. * * * Evidence on the question of delivery does not contradict or vary the terms of the instrument, but bears on the question whether the instrument, in effect, ever had a legal existence. * * * The intention to deliver, on the one hand, and of acceptance on the other, may be shown by direct evidence or presumed from the acts and declarations of the parties constituting a part of the *res gestæ,* and in a like manner the presumption of delivery may be rebutted and overcome by proof of a contrary intention or of acts and declarations from which the contrary presumption arises. * * * When the deed itself is not introduced in evidence and parol testimony regarding

its existence and contents is all that can be obtained, such testimony must be clear and convincing in every respect. 'Where the instrument rises to the dignity and importance of a muniment of title, every principle of public policy demands that the proof of its former existence, its loss and its contents should be strong and conclusive before the courts will establish a title, by parol testimony, to property which the law requires shall pass only by deed or will. * * * It is the policy of the law, adopted with a view to prevent frauds, that title to lands shall pass only by written instruments, and the difference is more in name than in fact between giving effect to a parol conveyance of lands and establishing a title to lands under an alleged lost deed, upon parol testimony of its contents and loss, unless the proof be clear and conclusive.' (*Thomas* v. *Ribble,* 24 S. E. Rep. (Va.) 241.) 'When an attempt is made to batter down recorded deeds by oral evidence of non-existing and unrecorded deeds, the oral evidence must be clear and strong, satisfactory and convincing, or it will not preponderate.' (*Connor* v. *Pushor,* 86 Me. 300, 29 Atl. Rep. 1083.) 'Parol proof of the contents of lost deeds must be so clear and positive as to leave no reasonable doubt of the substance of the material parts of the paper.' (*Bennett* v. *Waller,* 23 Ill. 97.) When the parties put their contract in writing, its terms and conditions are directed and limited by the instrument itself. The safety which is expected from such documents would be greatly weakened if, when they are lost, their contents could be established upon uncertain and vague recollections of witnesses.—*Rankin* v. *Crow,* 19 Ill. 626."

Adverting to the case of *Hudson* v. *Hudson, supra,* strenuously relied on by appellant, the essential distinction between it and other cases has been pointed out, but it is urged that case is conclusive here. A careful consideration of it discloses no analogy between it and the case at bar except that deeds were placed in an envelope. In the *Hudson case* the grantor executed seven deeds. They were then

enclosed in an envelope on which was the following type-written indorsement: "Deeds of John H. Hudson and his wife, Eliza E. Hudson, now sealed and to be kept sealed until after the decease of both, then by the custodian to be opened and delivered to each grantee, the delivery in this form to the custodian to be considered as a delivery of the deed in legal form." It was sealed and handed to Webber, cashier of the bank, who indorsed in writing below the typewritten indorsement, the words, "Received July 30th, 1912—W. G. Webber, cashier." That method of delivery was employed upon the advice of competent counsel. The deeds were executed and deposited in the envelope, each reciting that the deed, with six others, was executed by the grantors by way of partition. The envelope containing the deeds was placed in a safety deposit box. Some time later J. H. Hudson, the grantor, went to the bank and asked for the package. He told Fay, the president, he wanted it to make some change and would bring it back. Fay gave it to him. It was sealed, but when returned it had been torn open. After Hudson's death it was found to contain only six deeds to the other children, not including Oscar or Clifton. One of the questions for decision was, Was any deed executed to Clifton on July 27, 1912? The evidence showed that such a deed was one of the seven. One question discussed in the opinion was whether the deeds were delivered. It was held that when the grantor delivered the deeds to Webber he intended to part with their custody and control and to have them take effect as conveyances. The other question was, What interest was conveyed to Clifton by the deed that had been executed and destroyed? It was in this connection that the maxim *omnia præsumuntur contra spoliatorem* was discussed and applied. The maxim is invoked in this case, referring to that case as authority. It has no application here, because the evidence does not show that Josephus Martin, or anyone else, destroyed any instrument conveying an interest to appellant, or that such an

330—5

instrument was ever executed. The maxim is effective only where the facts render it applicable. It was said in that case that "when the grantee has proved that the deed was executed, the presumption is that it conveyed the highest title it could convey,—that is, a fee simple." This language is italicized in the brief of appellant, but, the evidence not establishing the fact upon which it rests, the principle is not applicable. A party seeking to establish the existence and contents of a lost deed by parol testimony must bear the burden of making such proof in a clear and conclusive manner. Deeds are evidence of title. Public policy demands that if they be lost the proof of their former existence and contents should be strong and conclusive before the court will establish title to property by parol testimony. (*Whipple* v. *Carrico,* 305 Ill. 164.) When parol proof of the existence and contents of a lost deed is offered as the only evidence thereof, the witness must have seen and read it and be able to speak pointedly and clearly as to its tenor and contents and to state whether it conveyed a life estate or a term of years and whether it was, in fact, executed by the supposed grantor. (*Dagley* v. *Black,* 197 Ill. 53.) Appellant signally failed to prove the making, delivery or contents of the alleged conveyance which he seeks to have restored. The contention has no better support than groundless conjecture.

Another contention of appellant is that Fred Collison, in drawing the deeds made in 1906 and in delivering any deeds at that time, was acting in a fiduciary capacity, and that, owing to that capacity, the burden was on him to show that the grantor was not overreached; that the presumption of law is, as to those deeds in which he or members of his family received an advantage, that the advantage was obtained by undue influence. The only direct question now before the court is whether a former deed was made to appellant conveying to him a fee simple title to the lands described previous to 1906, and that the deed was then

changed to convey a life estate with remainder over. The record does not show that a fiduciary relation existed be- tween Collison and Josephus Martin. From the witnesses produced by appellant it appears that Josephus expressed the intention of giving the home place to appellant. He stated to none of them the sort of estate he intended to give him. The contention is that he made the deed convey- ing the fee to appellant in 1902; that it, with deeds to other children, was left with Collison, and that in 1906 it was changed through influence exerted by him upon the grantor so as to convey a life estate. The evidence does not show that he ever said he would make a deed conveying the fee simple. It does not show that previous to 1906 he had made any deed to appellant. The probative value of evidence is often rendered stronger by incidental facts not likely to have been fabricated for the occasion. In 313 Ill. 365 it was said as to the expectations of appellant: "The evi- dence in the record does not warrant the specific perform- ance of the oral contract or promise of Josephus Martin to convey the land in question to Joe Martin. The contract, in the first place, was not proved as alleged. The court, perhaps, was warranted in the conclusion that the father, in order to induce his son to quit his employment in Chi- cago, had some kind of an understanding with him that if he would go on the home farm and farm it the farm would ultimately become his own. Even if there was a positive promise that he would give him the farm if he would quit his employment and go on the farm and work and farm it, the facts proved in the record do not warrant the en- forcement of this promise, as the Statute of Frauds is a complete defense."

If Fred Collison was the lawyer appellant contends he was,—shrewd, designing and unscrupulously looking after his and his wife's interest,—why did he not advise his father-in-law that his agreement was unenforceable and prevent the execution of any conveyance? If he pos-

sessed the influence over Josephus that, without any evidence to support it, it is insisted he wielded, why did he not induce him to disregard his unenforceable agreement and not make the deed to appellant? It is unexplainable, if that influence existed and Collison was as sinister and Josephus as helpless, mentally, as appellant contends, that more was not made of the opportunity to profit by the situation. It is irreconcilable with that alleged situation that appellant should have been given 400 acres of land for life and then to the legitimate heirs of his body, and other property outright of several thousand dollars in value. Again, as to the value of undesigned coincidences coming from the mouth of a witness not unfriendly to appellant, a stepdaughter of Josephus testified that "somewhere about June 11, 1906," he visited at her home and had dinner with her; that at that time he said that Collison "had changed his will and made out his deeds for him that day." He said he had fixed things so Doll could not have anything. Doll was appellant's wife. She repeated those statements in different forms on cross-examination. Again, on direct examination the question was asked, "Did you know whether Fred Collison had been attending to business for the old gentleman prior to that?" and the answer was, "Yes, he had, and he was a little bit afraid that Fred would beat him. He asked Mr. Gordon [husband of witness] if he thought Fred was just honest with him. Before that, Fred loaned money for him." With this evidence in view, slight though it may be in quantity, it is not probable that Josephus was overreached by Collison in making the disposition that was made of his property on June 11, 1906. The undesigned testimony shows that Josephus distrusted Collison. The witnesses who knew him best testified he was a man of strong will and determination. His will was *changed* that day. His deed was *made* to appellant that day giving him a life estate, and, as it was said when the case was last here, that is a greater interest than he could compel the grantor or

his successors in title to grant.   On whomsoever the burden of proof rested, the decree is in accord with the evidence and the legal and equitable principles applicable to it.

A further contention of appellant is that the deed attempts to convey an estate in remainder after a freehold and is therefore void.   As to that counsel say: "Assuming that Josephus W. Martin should by any chance have heirs of his body during his lifetime, our statute would make this an estate for life in Josephus Martin, and a fee simple, subject to his life estate, in the heirs of his body.   Yet, under said circumstances, if those heirs should die after becoming vested with this estate, this deed undertakes to say that at the time of the death of Josephus W. Martin, notwithstanding that it had been vested in them during his life in fee simple, that because they did not survive their father their estate should be divested and go to others.   It is therefore attempting to create in a deed an estate in a remainder after a freehold."   The conditional feature of the granting clause is that children of his body shall survive appellant.   If they shall be born and not survive him, the remainder over to the persons named becomes effective on his death.   Birth of children is not the expressed limitation.   It would have been a proper limitation.   But the owner was disposing of his property, and there was nothing illegal in the condition. If one child of his body survives him for the least assignable portion of time it will take the fee and the course of descent will be established.   Failing that contingency, the other persons named take the fee in the land conveyed to him for life.   The limitation is not upon children born to him and to his present wife.   In the course of human events he may not die childless.   *Kolmer* v. *Miles,* 270 Ill. 20, relied on in support of the contention of appellant, has no application to the limitation contained in the deed.   The contention is without merit.

It is contended by appellees that estoppel and *laches* bar the right of appellant.   The contention as to those points

has been considered. Without saying more, the principle underlying those defenses is applicable and both defenses are a barrier to relief, but we prefer to rest the decision upon the substantial defenses presented.

The decree of the circuit court is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Crow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Decree affirmed.*