(No. 19313.—

EMMA SIMPSON *et al.* Appellees, *vs.* EUNICE SPACKMAN WRATE, Appellant.

*Opinion filed December 20, 1929.*

ALEXANDER J. STROM, and KNIGHT & SWENSON, for appellant.

NORTH, LINSCOTT, GIBBONEY & NORTH, for appellees.

Mr. COMMISSIONER PARTLOW reported this opinion:

Appellees, Emma Simpson and Daisy Luce, who were daughters of Eliza Spackman, filed their bill in the circuit court of Boone county against their sister, the appellant, Eunice Spackman Wrate, and other heirs of their mother, to set aside a deed from the mother to appellant on the grounds of fraud, mental incapacity and undue influence, and they prayed that a certain memorandum in writing signed by the mother and given to appellees be held to be a first mortgage on certain real estate as security for claims of appellees against the mother. Two sons, one daughter and two grandchildren of Eliza Spackman filed a cross-bill, admitting the principal allegations of the original bill and praying for partition of the real estate. Appellant answered the bill and cross-bill, denying the right to relief under either. The cause was heard by the chancellor in open court, the cross-bill was dismissed for want of equity, a decree was entered in favor of appellees, and this appeal was prosecuted.

The evidence shows that Eliza Spackman, the mother, who was sixty-nine years old, died intestate at Belvidere, Illinois, on April 24, 1922, leaving surviving her as her only heirs-at-law, the two appellees, the appellant, two sons, three other daughters and two grandchildren. During her lifetime she owned a house and lot in Belvidere, which was her home. For about fourteen years prior to her death she had arthritis deformans. Her joints became solidified and she was practically helpless and suffered great pain. At the time the mother was taken ill, Daisy Luce, appellant and two sons, John and Frank, were living with the mother. John died in 1910 after a lingering illness. Daisy took care of John until he died and she then took care of her mother until 1914 or 1915. Appellant was the youngest daughter and she was going to school. During the winter of 1912 or

1913 Emma Simpson took her mother to Chicago and to a mineral spring for treatment. The house in which the mother was living was not modern and was out of repair. In the spring of 1913 the mother told Emma that the house needed repairs; that it was not heated; that her rheumatism was so bad she did not know what to do; that she was afraid the house might burn and she could not get out; that she had no money to pay taxes or to keep up the place, and that Frank was working but his work was not steady and his wages were small. Emma replied that she was in a position to remedy these conditions, and that she had $1200 or $1300 on a paid-up insurance policy which was available to repair the house. The mother said she would not allow any of her children to put improvements on her house, buy coal and pay taxes without reimbursement, and that she would sign a mortgage or any kind of a paper to secure Emma, so that when the property was sold she could be reimbursed. After this conversation Emma repaired the house, installed a furnace, lights, water, bath, toilet, and also expended about $700 for other necessities. On October 17, 1914, appellees, appellant, Frank and his son Clinton, and Mrs. Sweet, who was a sister of Eliza Spackman, were with the mother in the home. The mother said she was so happy and thankful for the condition of her home that she wanted Emma to draw up some kind of a paper that would secure her for the money she had expended and that the mother would sign it with Mrs. Sweet as a witness, so that it would secure Emma for everything she had paid and for anything further the mother in her helplessness had to ask of Emma. Emma drew up the following document:

"BELVIDERE, ILLINOIS, *October 17, 1914.*

"I hereby acknowledge my indebtedness to my daughter, Daisy Spackman, for her services in nursing and caring for me during my illness, and to my daughter, Emma Spackman Simpson, for sums expended in the improvement of my property.

Witness: Emily D. Sweet.          ELIZA SPACKMAN."

After this document was signed it was placed in the hands of Mrs. Sweet, where it remained for several years. The evidence shows that at the time it was executed the mother stated to Emma Simpson that it was a mortgage on the property and every dollar must be paid back; that she did not want it recorded, but after she was dead, if the property ever had to be sold, payment would be made, and that she wanted to use the property during her lifetime. A few days after it was signed, the mother, in the presence of appellant, said to Daisy Luce, "Daisy, you are so good to me I have given Em a mortgage for you and Em." Similar conversations at other times were had in the presence of appellant, who endorsed many of the checks later given by Emma, and appellant paid many of the bills with these checks. The existence of this written instrument was known by all of the children.

On April 24, 1922, about 10:15 A. M., which was the day the mother died, there was filed for record a warranty deed dated November 28, 1921, from the mother to appellant conveying the property. On the outside of the deed when it was recorded was the following: "Do not publish. Mail to Ab Wrate." The evidence shows that on the day the deed was recorded Wrate went to the home of appellant, procured from her a key to a safety deposit box, received from her a note to the officers of the bank directing them to allow him to open the box, opened the box, secured the deed, filed it for record and told the recorder he did not want it published. The mother died on the afternoon of that day. In January, 1922, the mother turned over all of her personal property to appellant. She gave her seven $10 gold pieces, which were to be given to the children, and she gave her a $1000 life insurance policy, out of which the funeral expenses and final bills were to be paid. After Daisy Luce left home, in 1914 or 1915, appellant took care of her mother until she died.

The decree found that the mother agreed with appellees that the written instrument should be a first lien upon the real estate to secure the claims of appellees, which were to be paid after her death out of the proceeds of the sale of the property; that by common consent practically all of the children contributed to the support of the mother, but there was no agreement as to the payment of any other claims except those of appellees; that the written instrument was accepted by appellees as security for their claims; that by reason of this instrument and the verbal contract entered into appellees acquired an equitable lien against the property, and they were to be paid equitably, in proportion to any other extraordinary bills or claims that might be incurred; that this was an equitable settlement and was fully understood and tacitly agreed to by the mother and all of her children; that the agreement was analogous to a trust, whereby no claim for extraordinary services was to have preference over any other claims of the same kind; that the services of appellant in caring for her mother were in the nature of an extraordinary claim and she was entitled to share *pro rata* with the claims of appellees; that the deed executed by the mother to appellant was impressed with and was subject to the extraordinary claims of appellees, and the title was held by appellant in trust, so that the estate would not have to be probated or put to costly litigation, and appellant would share equitably and *pro rata* with the claims of appellees; that the conveyance was along the line of a family settlement and was so understood by the mother and her children; that appellant took the deed with full knowledge of the claims of appellees and with the understanding that she was to share with appellees equitably in the property; that Emma Simpson furnished $1700 for repairs, payment of taxes and other expenses, which, together with interest, amounted to $2050; that Daisy Luce was entitled to pay for services rendered for five years, amounting to $1560; that appellant, for her services, was

entitled to $2090; that the percentage of claims was as follows: Emma Simpson 31.5 per cent, Daisy Luce 23.96 per cent, Eunice Wrate 44.54 per cent; that the property was not adequate in value to pay the claims in full, and that the claimants should be paid from the proceeds of sale on the basis of said percentage; that in January, 1922, the mother turned over to appellant some of her keepsakes, together with $70 in gold, which was intended for her children, also an insurance policy of $1000, out of which funeral expenses and final bills were to be paid, and that it would be inequitable and fraudulent to permit the Statute of Frauds to bar the claims of appellees. The property was ordered sold and the money distributed on the basis of the percentages as found by the decree.

It is insisted by appellant as grounds for reversal that the decree found that the mother, on the date the deed was executed, was of sound mind and under no restraint; that no fraud or undue influence was exercised in making or accepting the deed; that the written memorandum, upon which parol evidence was received, was insufficient and in violation of the Statute of Frauds; and that the deed was given for a valuable consideration, consisting of long years of service and sacrifice on the part of appellant.

Appellees contend that all of the transactions shown by the evidence were in the nature of a family settlement, and prior to the death of the mother the property was held in trust for the benefit of appellees and appellant; that by reason of the written memorandum and the verbal contracts entered into, the claims of appellees were equitable liens against the property as against the mother and her heirs, devisees and assigns, who took the title with notice, and as against every purchaser except *bona fide* purchasers for value; that appellant took the deed with knowledge of the claims and rights of appellees and subject to their equities, and she is estopped to claim the contrary; that the Statute of Frauds is no defense where it will permit the perpetra-

tion of a fraud, and that the full or part performance of the contract took it out of the Statute of Frauds.

There is no controversy as to the services performed by Daisy Luce and appellant or as to the value thereof, or that the amount allowed Emma Simpson was, in fact, expended by her for the benefit of her mother and the property. All of the parties practically agree on these points. The primary question, therefore, is as to the legal effect of the written memorandum and the verbal contract entered into and the acts done thereunder.

Courts of equity favor the settlement of disputes among members of a family by agreement rather than by resort to law. (*Cole* v. *Cole,* 292 Ill. 154; *Dunham* v. *Slaughter,* 268 id. 625; *Hall* v. *Hall,* 125 id. 95; 12 Corpus Juris, p. 322.) Such agreements will be enforced where there is an existing contract signed by all of the heirs, none of whom are under disability, where there is no misunderstanding or fraud, where they are based on a valuable consideration, are reasonably certain as to the subject matter and terms and are equitable and just. (*Hagen* v. *Anderson,* 317 Ill. 173; *Edwards* v. *Brown,* 308 id. 350.) The document signed by the mother on October 17, 1914, is very indefinite. It does not state the amount due appellees, does not describe the real estate, does not state that it is a mortgage or that appellees are to be paid out of any particular fund or property. It is simply a recognition of the indebtedness due from the mother to appellees. If the case depended entirely upon this document it would not be sufficient to entitle appellees to relief. The case, however, does not depend entirely upon this instrument. Parol evidence was admitted as to conversations between the mother and appellees, in which the mother, before the improvements were made and the money was expended, told appellees that she would not allow any of her children to make improvements on her house, buy coal, pay taxes or other expenses without their being reimbursed, and that she would sign a mortgage or

any kind of a paper to secure them, so that when the property was sold they would be paid. The improvements were made upon the strength of this statement. After the improvements were made, in the presence of various members of her family, including appellant, she executed the document, placed it in the hands of her sister and said that it was a mortgage on the property, which was all the property she owned, and that payment would be made after her death when the property was sold. There is no controversy as to the description of the property intended to be mortgaged, there was no fraud exercised in the execution of the document, and the terms of the agreements, oral and written, were just and equitable. All of the conditions were fully performed by appellees. Appellant accepted the deed from her mother with full knowledge of all of the facts.

Where a party takes title to land without consideration and with full knowledge of the existence of a verbal contract to convey the land and of its full performance on the part of the promisee, the title of the grantee and of his heirs and devisees is subject to the equities of the promisee. (*Gladville* v. *McDole*, 247 Ill. 34.) In that case it was held that a verbal contract to convey land in consideration of services rendered by the promisee in caring for the promisor will be specifically enforced in equity against the heirs of the promisor's wife, who received the title without consideration and with full knowledge of the contract and its performance, where the services, sacrifices and deprivations of the promisee in carrying out the contract could not be estimated in money value and where it would be a fraud on the promisee to sustain the defense of the Statute of Frauds. It was also held that courts of equity will not permit the Statute of Frauds, the only purpose of which is to prevent fraud, to be used where the effect will be to accomplish a fraud, and where a verbal contract has been performed, either fully or in part, by the party seeking the remedy, and the facts are such that it would be a virtual fraud to per-

mit the defendant to interpose the statute, a court of equity will not listen to that defense.

In *Warren* v. *Warren*, 105 Ill. 568, a father promised his daughter a farm if she would remain with him and perform services in and about the farm. The daughter performed the services but the father died without making the conveyance. The daughter filed a bill for specific performance against the administrator and heirs and they pleaded the Statute of Frauds. It was held that even if the contract was not fully performed it would operate as a monstrous fraud upon the daughter if the contract were not executed; that the father had agreed to convey the land to the daughter for the purpose of canceling his indebtedness to her, and that she was thereby lulled into inaction and was induced to forbear from procuring evidence of his indebtedness to her or procure security for its payment, and that if the contract was not enforced it must necessarily operate as a great and irreparable fraud upon her.

In *Dalby* v. *Maxfield*, 244 Ill. 214, a brother promised a sister that if she would convey her interest in a farm to him and would live with him and care for him he would leave the farm to her. He died but failed to perform the contract. This court, on page 218, said: "This contract does not belong to that class wherein it is necessary to show possession taken and the making of valuable and lasting improvements in order to take the case out of the operation of the Statute of Frauds. That statute, passed to prevent frauds, cannot be resorted to for the purpose of perpetrating a fraud. Any act performed under a parol contract which would work a fraud on the party if the contract was not enforced may be sufficient to take the case out of the operation of the Statute of Frauds."

The record shows no agreement on the part of the mother to pay appellant for her services in caring for the mother for about seven years. There is no dispute but that appellant performed valuable services at great sacrifice and

that she should be compensated therefor. Prior to her death the mother not only deeded her only real estate to appellant, but she delivered to her all of her personal property. It is apparent that while these gifts and transfers on their face were absolute, yet they were not so intended. Out of the personal estate appellant was to pay the funeral expenses and certain debts and was to deliver part of the property to other heirs. The decree found that these deliveries were in the nature of a trust and were to avoid administration and litigation, and this view is sustained by the evidence. Several of the brothers and sisters of appellant and appellees, and Mrs. Sweet, the sister of the mother, who were present when these transactions and conversations took place and who were familiar with all of the facts, testified for appellees, and there can be no doubt as to the intentions of the mother. Appellant was present on most of these occasions and she does not dispute what was said and done. She had full knowledge of the agreements, which were performed in full by appellees, and she took title with such knowledge and notice. To permit appellant to retain this real estate would operate as a fraud upon appellees, and courts of equity will not permit the Statute of Frauds to operate where the effect will be to accomplish a fraud. The evidence sustains the decree.

The record contains considerable evidence as to the mental condition of the mother at the time the deed was executed. The decree contains no finding on this question and it is not argued by appellees, but it is argued by appellant, and she insists that the mother was mentally competent to make the deed. In view of the fact that appellant has argued the question, we deem it proper to say that the evidence raises a serious question as to the mental ability of the mother to execute this deed and shows that this condition was known to appellant. It might be forcefully argued that the deed should be set aside on account of the mental incapacity of the mother to execute it, as was alleged in the bill.

Appellees were permitted to testify as to the terms of the contract. Appellant insists that they were incompetent witnesses under section 2 of the Evidence statute, and that in the absence of their testimony the record is barren of any proof which would sustain the decree. In *Seaton v. Lee,* 221 Ill. 282, a bill was filed to set aside a deed made by Seaton, in his lifetime, to his sister, Lucetta Lee. The defendant insisted that the complainants were incompetent witnesses because she was defending as heir and devisee of Seaton. This court held that the purpose of the bill was to set aside a deed made to the defendant and that she was defending as grantee; that her rights and interests, either as heir or devisee, were not attacked and could not be affected by the result of the suit, except that if the averments of the bill were true and the deed was set aside her interest in the residue of the estate would be increased; that the purpose of the statute was to protect the estates of deceased persons from the assaults of strangers; that this was not an assault upon the estate of the deceased but was an attack upon the grantee; that the theory of the statute was that as the mouth of the deceased had been closed by death, the mouth of the antagonists should in the courts be closed by law; and that the complainants were competent witnesses. Appellant in this case was not being sued as an heir of her mother but was being sued as the grantee of her mother, therefore appellees were competent witnesses. Even if they were incompetent witnesses, the contract was established by the evidence of other witnesses, and the admission of their evidence did not constitute reversible error.

We find no error, and the decree is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Decree affirmed.*