(No. 27867.—)
HARRY OSGOOD, Appellant, *vs.* HARRY ZIEVE *et al.,*
Appellees.

*Opinion filed November 22, 1944.*

RICHARD WEINBERGER, of Chicago, for appellant.

WELCH & HOFFMAN, (MAURICE L. DAVIS, of counsel,)
both of Chicago, for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

Harry Osgood, plaintiff, filed a complaint in the superior court of Cook county against Harry Zieve and Mortimer J. Rubenstein, defendants, seeking removal, as a cloud upon his title to certain real estate in Chicago, of an affidavit, executed and recorded October 28, 1940, by

Zieve, claiming ownership of a one-fifth interest in the property. The complaint alleges that, by his deed of March 18, 1939, Zieve conveyed all his interest in the property to plaintiff upon the sole consideration of plaintiff's dismissal of an action then pending in the superior court. Defendants' answer admits delivery of the deed to plaintiff conveying Zieve's one-fifth interest, but avers a prior agreement by plaintiff to form a corporation to which title tô all of the real estate was to be conveyed, and that the sole consideration for Zieve's deed was a twenty per cent interest in the capital stock of the new corporation. By a counterclaim, defendants allege that plaintiff entered into possession of the property; that he never organized a corporation, and that the consideration for the transfer of the title to plaintiff has wholly failed. Defendants sought a reconveyance by warranty deed. Plaintiff's answer to the counterclaim denied any agreement, either to organize a corporation or to give shares of stock in one to Zieve, and again asserted that dismissal of the prior action in the superior court constituted the sole consideration for the conveyance. In accordance with the recommendation of a master in chancery, a decree was entered directing a reconveyance to Zieve and an accounting between the parties. Plaintiff prosecutes a direct appeal to this court, a freehold being necessarily involved.

Plaintiff, Zieve, and Charles Jacobs, in October, 1938, jointly purchased a parcel of real estate, known as the Lord Manor Apartments, located at 224-234 East Huron street in Chicago. The property is operated as a rooming house, and consists of a row of eight buildings, three or four stories each, comprising 125 rooms. At the time of the purchase, the real estate was encumbered by an indebtedness, in excess of $100,000, secured by a mortgage. Walter D. Dwight was its exclusive agent. All negotiations with Dwight for the property, culminating in its acquisition, were conducted solely by Jacobs. A written con-

tract was executed in Jacobs's name alone, on behalf of the purchasers, but it was not introduced in evidence. The testimony is conflicting with respect to details of previous arrangements between the parties.

According to Jacobs, his agreement with Dwight called for delivery by himself, Jacobs, of $3500 in cash and some defaulted securities having a par value of $12,000, a credit of $1350 on the agreed cash purchase price to be allowed Jacobs, providing Dwight successfully disposed of a portion of the defaulted securities for $2700. He testified that he offered Zieve, a real-estate broker, a one-half interest in the real estate, provided the latter raised the actual cash required, informing him that between $2000 and $3500 would have to be paid, depending upon the success attained by Dwight in liquidating the defaulted securities. Zieve agreed to Jacobs's proposal. In August or September, 1938, he discussed the matter with plaintiff and Charles Osgood, his brother, and the latter agreed to advance the cash required for plaintiff to participate. Zieve and the Osgood brothers disagree sharply as to the terms of their agreement, the former stating that in his offer to plaintiff and Charles Osgood they were clearly informed that Jacobs was to receive a one-half interest in the property upon payment by him of defaulted securities, and that the other one-half interest was to be divided, one third to plaintiff and one sixth to himself, he to advance $500 and plaintiff to supply the balance of the cash required. He further stated he informed them that whatever money they invested would be returned out of the first receipts from the property. Zieve denied any discussion concerning a division of the property proportionately to the amounts each invested. Plaintiff testified that Zieve was very indefinite with respect to the purchase price, stating a share would cost $1500 or $1600, and certainly not more than $2000; that he was to receive an indefinite proportionate share, depending upon the cost of the property and

the money invested; that Zieve stated he had already paid Jacobs $500, and that retention of a one-half interest by Jacobs, and division of the other one-half, one third to himself and one sixth to Zieve, was not mentioned. He denied Zieve's testimony that he was to supply all the cash required to finance the transaction, or that his money was to be refunded. Charles Osgood substantially corroborated his brother's version, except to declare that Zieve did promise the return of the money advanced by them from the first receipts. Upon the actual closing of the deal, according to Jacobs, he turned over to Dwight defaulted securities of the par value of $12,000, together with an amount of cash not precisely determinable from his testimony. The evidence does disclose, however, that both before and after the sale was consummated, Charles Osgood isued a series of checks, representing money paid on behalf of plaintiff. Among these is one for $300, dated October 8, 1938, used by Jacobs as an earnest money deposit; another, dated November 7, 1938, for $1600, payable to J. H. Lord, Jr., and Willie Mae Lord, owners of the equity of redemption; one, dated November 18, 1938, for $200, payable to Zieve and by him endorsed to Jacobs, and others in varying amounts, all payable to Jacobs. Zieve testified he invested $500, evidenced by Jacobs's receipt, dated November 5, 1938.

November 9, 1938, a quitclaim deed was executed by the owners of the equity of redemption to Marilyn Jacobs, wife of Charles. November 25, 1938, Jacobs and his wife executed and delivered quitclaim deeds to plaintiff and Mortimer J. Rubenstein, as Zieve's nominee, conveying one-third and one-fifth interests, respectively. The increase from one sixth to one fifth, contained in the deed to Zieve's nominee, is explained as being in payment of a commission of $350 owed by Jacobs on a prior transaction. Plaintiff testified that, upon receipt of the deed, although believing himself entitled to a greater interest

than one third, he was assured by Zieve that the division was correct, and subsequently recorded his deed.

Dissension arose between the cotenants, culminating, about a month following delivery of the deeds by Jacobs, in the appointment by plaintiff of Samuel Orner, a broker and his brother-in-law, to investigate. From the time of his appointment, plaintiff stated that Orner was in complete charge of the transaction for him. Orner testified that, early in 1939, Jacobs showed him a final statement covering the purchase of the property, and that, based upon the information contained in this statement, he accused Zieve and Jacobs of using plaintiff's money exclusively to finance the transaction. He further testified that he thereupon recommended that he, Orner, be allowed to manage the property; that plaintiff's interest be increased to fifty-one per cent, either in the real estate itself or in a corporation to be organized to take title; that the remaining forty-nine per cent be retained by Zieve and Jacobs, and that, if this proposal was unacceptable, plaintiff would agree to refund their investments, if any. Orner further stated he informed them that if no satisfactory agreement could be effected, legal action would be instituted to protect plaintiff's rights, and that complaints would be registered with the State's Attorney against both. He denied making threats of bodily harm to anyone. Orner also testified that Zieve volunteered to turn over his entire interest in the property, to accomplish any of the proposals suggested, but that Jacobs, although offering to execute a promissory note in payment of plaintiff's interest, was adamant in his refusal to co-operate.

According to Jacobs, at the request of Orner, he showed the latter the contract covering the purchase of the property, and Orner appeared satisfied and said it was a "good deal." He testified that no charges were made by Orner against Zieve or himself, and that Orner suggested the formation of a corporation, the shares to be divided in

the ratio of forty per cent to plaintiff, twenty per cent to Zieve, and forty per cent to himself, Jacobs. He further testified that, during the course of the negotiations and prior to settlement with plaintiff, he received from plaintiff, Orner and Weinberger, plaintiff's attorney, threats of physical violence, if he failed to effect an agreement. Zieve corroborated Jacobs, adding that when the latter offered to refund plaintiff's money Orner asked for a profit of $1000 or $2000. Zieve also testified to a veiled threat made by Orner.

February 14, 1939, plaintiff executed and filed with the recorder of deeds an affidavit claiming ownership of an "undivided interest" in the real estate. February 24, 1939, he filed a complaint in the superior court of Cook county, charging Zieve and Jacobs with fraud, alleging that they used his, plaintiff's, money in payment of the entire purchase price, and that he had accepted the deed with the understanding that Zieve and Jacobs had contributed their proportionate shares. Plaintiff claimed ownership of the entire property.

According to Zieve, subsequent to the filing of plaintiff's action against Jacobs and himself, three separate conversations occurred in March, 1939, the tenor of each being that his twenty per cent interest would be protected, that it would be received either in the form of real estate or in shares of stock in a corporation to be organized to take title, and that, in either event, he would participate in the management. Zieve stated that, on the twelfth, following a hearing in court, Orner also said the action was not being directed against him; that, on the fifteenth, plaintiff and Orner informed him they were purchasing Jacobs's interest, and requested of him, three deeds,—the deed from Marilyn Jacobs, a deed from him to plaintiff, and one from Rubenstein, his nominee; that, on the eighteenth, a messenger from the office of Weinberger, Osgood's attorney, called to receive the deeds, which were delivered, and

that, prior to delivery, upon Zieve's inquiry by telephone concerning a receipt, Orner assured him there was no occasion for worry, again urging delivery of the deeds and stating that his interest would be protected. This last conversation was confirmed by letter which Zieve declares he mailed on the same day, reciting delivery of the deeds and stating that, in return for them, Zieve was to receive "a twenty per cent interest in the corporation that will be formed to take over title" to the property. It is conceded that no money was paid to Zieve as a consideration for these deeds. Although denying receipt of the letter, Orner admits the telephone conversation preceding delivery of the deeds. He testified Zieve stated that, upon consummation of a settlement with Jacobs, Orner could have Zieve's deed, provided he, Orner, did the "right thing," an expression explained by Orner as meaning Zieve was to receive a twenty per cent interest in the property upon his contribution of an amount to cover the cost of such interest. Subsequent testimony of Orner is to the effect that he did not inform Zieve his twenty per cent interest would necessarily be in stock of a corporation, and that this was "left open."

March 20, 1939, Jacobs and his wife, by a quitclaim deed, conveyed their interest in the real estate to plaintiff, pursuant to provisions of an escrow agreement, providing for payment by plaintiff of certified checks for $1250 and $100 to Jacobs and his attorney, respectively. A note for $100, signed by Jacobs, and payable to plaintiff, was returned to Jacobs. Zieve was not a party to the escrow agreement. March 28, 1939, plaintiff's prior action in the superior court against Zieve and Jacobs was dismissed.

The evidence also discloses that in July, 1939, Orner was successful in completing an agreement with the mortgagee extending the time of payment of the mortgage indebtedness, and that, during the interim, from March 18, he kept Zieve informed as to the progress of his negotia-

tions. Zieve testified that when Orner notified him an extension had been granted, he, on July 28, 1939, wrote Orner suggesting the immediate formation of a corporation and the assignment of a twenty per cent interest in the property to him; that about a week later he telephoned Orner, repeating this request and asking an accounting; that, on August 17, 1939, Orner presented to him a memorandum disclosing a total purported capital investment by plaintiff of $11,085.83, and that he remonstrated with Orner because no previous information had been furnished as to additional moneys required of him. An up-to-date statement on the financial condition of the property was requested in a letter to Orner, dated September 8, 1939, in which Zieve stated he would later consult with Orner concerning the figures previously received. Orner denied receipt of the letter, but admitted furnishing the memorandum to Zieve. He testified he then informed Zieve that one fifth of the amount invested by plaintiff was about $2300, and that, although he knew Zieve had never invested five cents, a credit for $500 would be allowed, provided Zieve contributed $1800, that Zieve stated he would deliver a check in a few days but it was not forthcoming. Joe Gould, a real-estate broker occupying an office in the same suite with Zieve, corroborated the latter's version of a conversation in November, 1939, with Orner. Gould stated Orner informed Zieve he intended to incorporate and that Zieve's interest would be returned in stock. Orner contradicted this testimony of Gould.

The master to whom the cause was referred found that Zieve was entitled to a twenty per cent interest, "subject to contribution by him to plaintiff in such amount as may be necessary to make up one-fifth of the total cost to plaintiff of acquiring title to the property." He also recommended an accounting between the parties. The chancellor entered a decree approving the master's report and re-referred the cause for an accounting, as recommended.

The decree further provided for the ultimate transfer, by deed, of a one-fifth interest in the real estate to Zieve upon payment by him to plaintiff of such amount as may be found necessary upon the accounting.

To sustain the decree, Zieve maintains that the evidence is sufficient to establish either a resulting trust or a constructive trust. Plaintiff, on the other hand, contends that no confidential relation having been disclosed between Zieve and plaintiff, or Orner, the only possible remaining basis for establishing a constructive trust would be fraud, and that, in the absence of findings in the master's report as to fraud on the part of either plaintiff or Orner, the decree cannot stand. Neither the pleadings, the master's report, nor the decree itself contains any reference to a resulting or a constructive trust, and, in our opinion, application of either theory is unnecessary to a decision. If, under the evidence, Zieve is entitled to a return of his interest in the property, sufficient justification for the granting of this relief may be found in the broad general powers of a court of equity. Here, undisputed testimony discloses that Zieve was the owner of an undivided one-fifth interest in the real estate in controversy by virtue of a deed from Jacobs and his wife. March 18, 1939, he conveyed this interest to plaintiff by quitclaim deed. The decisive factual issue presented by the pleadings is whether the consideration for the delivery of this deed was (1) the dismissal of the prior action in the superior court, as plaintiff insists, or (2) a twenty per cent interest in the shares of a corporation to be organized, as urged by Zieve. Testimony on this issue is highly contradictory and irreconcilable. The master found Zieve equitably entitled to a reconveyance, subject to payment by him to plaintiff of such amount as may be determined upon the accounting between the parties. This report was, in turn, approved by the chancellor. The master saw the witnesses and heard them testify. Although his conclusions do not carry

the weight of the verdict of a jury, nor the findings of a chancellor who has heard evidence, they are, nevertheless, entitled to weight in determining the credit to be given the testimony. (*Kosakowski* v. *Bagdon,* 369 Ill. 252.) His findings, when approved by the chancellor, will not be disturbed unless manifestly against the weight of the evidence. (*Pasedach* v. *Auw,* 364 Ill. 491.) The evidence in support of the decree, among other things, tends to show that plaintiff's prior complaint was dismissed by the superior court subsequent to the delivery of a deed to plaintiff by Jacobs and his wife, pursuant to consummation of an escrow agreement to which Zieve was not a party; that, immediately prior to delivery of the deed by Zieve to plaintiff, Orner advised Zieve he would be entitled to a twenty per cent interest in the property, either by issuance of corporate shares, or otherwise, contingent upon payment of an amount deemed sufficient to cover the cost of such interest, and that no money consideration passed to Zieve upon delivery of his deed. On the other hand, if consideration for delivery of Zieve's deed rested solely upon dismissal of plaintiff's prior action, as claimed, there would have been no occasion, subsequently, to keep the latter informed concerning progress in obtaining an extension of time for payment of the mortgage indebtedness and other matters, as testified by Orner. A consideration of all the evidence, in the light of the master's findings, approved by the chancellor, leads to the conclusion that it would be contrary to equity and good conscience for plaintiff to retain the interest conveyed to him by Zieve under the circumstances recounted. It follows necessarily that the decree is not manifestly against the weight of the evidence.

The decree of the superior court of Cook county is affirmed. *Decree affirmed.*