(No. 28934.—

LEROY CHAMBERS *et al.*, *vs.* HENRY APPEL *et al.*—(MINNIE CHAMBERS *et al.*, Appellees, *vs.* HENRY APPEL, Appellant.)

*Opinion filed November 21, 1945—Rehearing denied Jan. 17, 1946.*

GALBRAITH & BAYMILLER, of Peoria, for appellant.

L. O. EAGLETON, and WAYNE H. MATHIS, (MAX J. LIPKIN, of counsel,) all of Peoria, for appellees.

Mr. JUSTICE MURPHY delivered the opinion of the court:

This appeal is prosecuted to reverse a decree of the circuit court of Peoria county entered in a partition suit which was instituted to divide 160 acres of farm land among certain persons as heirs-at-law of Minnie Etta Murdock Appel. During the course of the proceeding a contest developed to determine whether such lands should be conveyed pursuant to an oral contract alleged to have been made by Mrs. Appel in 1920, or should be partitioned according to the Statute of Descent. Minnie Etta Murdock Appel died April 27, 1942, leaving, as her only heirs, Henry Appel, her husband, Stella Jane Smith, a sister, and Minnie Chambers, Louise Chambers Hunkler and LeRoy Chambers, nieces and nephews, they being the children and only heirs-at-law of Margaret Chambers, a sister of Mrs. Appel who preceded her in death. This suit was instituted by LeRoy Chambers and Stella Jane Smith, and Henry Appel, Minnie Chambers, Louise Hunkler and Arthur Hunkler were made parties defendant. Before service was obtained on any of the defendants, and without knowledge of the pendency of this action, Henry Appel, Minnie Chambers and the Hunklers filed a second suit for partition. Before either cause had gone to a decree, Stella Jane Smith and LeRoy Chambers conveyed the undivided shares they would have as heirs of Mrs. Appel to Henry Appel. Thereafter, no further action was taken in the second suit and there was a realignment of parties in the first action. Stella Jane Smith and LeRoy Chambers were dismissed from the case and Henry Appel became the sole plaintiff. The Hunklers and Minnie Chambers continued as defendants.

Appel filed an amended and supplemental complaint and prayed for the assignment of a homestead estate in a 40-acre tract and asked for a partition of the whole, a one-twelfth to Minnie Chambers and Louise Hunkler each, and the balance to him. He claimed the one-half interest he

received as the surviving husband, the one-fourth interest he acquired from Stella Jane Smith and the one-twelfth deeded to him by LeRoy Chambers.

Minnie Chambers and Louise Hunkler, appellees, filed an answer and counterclaim, the substance of which was, that in 1920 they entered into a verbal agreement with Minnie Etta Murdock whereby they were to care for her and her mother as long as either should live and in consideration of such service, Minnie Etta Murdock was to will them all her property both real and personal. It was further alleged that they discontinued teaching in the public schools and devoted all their time and attention to the care of Minnie Etta Murdock and her mother, Jane Murdock, until the mother died in 1925, and then to the aunt, until her death in April, 1942. It was alleged that Minnie Etta Murdock married appellant on November 12, 1941, that they established a home on one of the tracts in question, but that after they had gone to their new home appellees continued to care for Minnie Etta Murdock's poultry and livestock, did her housework, including washing and mending. It was alleged that they did not know until after the death of Minnie Etta Murdock Appel that she had not executed a will giving appellees all of her property. It was alleged that appellant had acquired deeds from Stella Jane Smith and LeRoy Chambers and had given them money from the estate account, all with the knowledge of appellees' claims. Appellees prayed that appellant be required to account for any money he had drawn from the estate funds.

Appellant replied to the counterclaim, making a general denial of all facts in reference to the making of the alleged contract and its performance by appellees. He pleaded that the acts of appellees subsequent to the death of Minnie Etta Murdock Appel estopped them from claiming specific performance. The Statute of Frauds was pleaded. Appellees' reply joined issue on many questions of fact. The

cause was referred to a master and he found that the contract had been proved as alleged and that appellees had fully performed and were entitled to specific performance. He also found that appellant purchased the outstanding interests of Mrs. Smith and LeRoy Chambers with notice of appellees' claims. He found that appellant had withdrawn $2375 from the estate account and used it in the purchase of such interests and that he should account for the same. Exceptions were overruled and a decree was entered, confirming the report and decreeing specific performance. This appeal followed.

Some of the points urged for reversal relate to disputed questions of fact and the weight to be accorded certain parts of the evidence. It is well established that the master's conclusions on questions of fact do not carry the weight of the verdict of a jury, nor of the findings of a chancellor who has heard the evidence, but they are, nevertheless, entitled to weight in determining the credit to be given the testimony. The master's findings when approved by the chancellor will not be disturbed unless manifestly against the weight of the evidence. *Osgood* v. *Zieve,* 388 Ill. 226.

To justify the decree entered in this case, it must appear from the evidence that there is no doubt that a contract was made and that its terms have been clearly and conclusively established. (*Hickey* v. *Hickey,* 374 Ill. 614; *Fierke* v. *Elgin City Banking Co.* 366 Ill. 66; *Aldrich* v. *Aldrich,* 287 Ill. 213.) Oral contracts to devise or convey real estate or personal property are enforced in equity in certain cases, so as to furnish a more complete and fuller justice than that afforded by an action at law. (*Edwards* v. *Brown,* 308 Ill. 350.) The remedy is afforded where the contract has been performed by one party in such a way that the parties cannot be placed *in statu quo* or damages awarded which would be adequate compensation. (*Weir* v. *Weir,* 287 Ill. 495; *Koenig* v. *Dohm,* 209 Ill.

468.) The performance of the contract by the one who seeks enforcement must be such that if the remedy is withheld it would be a fraud upon him if the agreement were not carried out. (*Holsz* v. *Stephen,* 362 Ill. 527; *Nelson* v. *Nelson,* 334 Ill. 43.) Where the Statute of Limitations bars a recovery at law, or where improvements have been made or services performed which cannot be adequately compensated for in an action at law, or where failure to carry out the agreement will perpetrate a fraud upon the party performing, then the remedy by specific performance is available. *Holsz* v. *Stephen,* 362 Ill. 527.

The deceased was the daughter of Robert and Jane Murdock. She received title to 120 acres of the 160 involved in this suit through her father's will. The other forty acres she acquired by purchase after his death. She was born in 1876 and lived with her parents until the father died in 1914, and thereafter she and her mother resided on one of the tracts in question. The mother had a life estate in 80 acres of the land, and at the time the contract was claimed to have been made, Minnie Etta Murdock owned the fee in such 80 acres subject to the life estate, and owned the other 40 acres outright. If she had any personal property at that time, its value was not alleged or proved. She was never married until November 12, 1941, when she married appellant.

When Louise Hunkler was about two years of age (1903) she was taken to her grandparents', the Murdocks', home. Minnie Chambers was taken into the Murdock home in 1916, soon after her mother's death. The two girls attended the public schools, graduated from high school and Minnie completed a college course. They owned 80 acres of land, which they had come into possession of on their mother's death, and the evidence shows that the income from it was applied in the payment of expenses of their education.

It is alleged in appellees' counterclaim that in June, 1920, Louise had completed one year of teaching, Minnie had finished her college course and contracted to teach the ensuing year at Hopedale. It was further alleged that at that time Jane Murdock, the mother of Minnie Etta Murdock, was seventy-one years of age, ill and required constant care and nursing, that Minnie Etta was forty-five, frail and unable to care for her mother; that in May or June of that year, Minnie Etta made appellees an oral proposition that if they would discontinue teaching, stay in the home and devote their time and attention to the home and care of Jane Murdock and Minnie Etta as long as they or the survivor of them should live, Minnie Etta would make a will in which she would leave them all her property, both real and personal. It is alleged that appellees accepted such proposition, discontinued teaching, that they stayed home and cared for their grandmother and Minnie Etta, cultivated the garden, cared for the yard, raised poultry and performed all the labor necessary to care for the home and the property which Minnie Etta owned. The substance of the allegations of the counterclaim is that appellees entered upon the performance of their contract in August, 1920, and continued with the fulfillment of its provisions until Minnie Etta's death in 1942. It appears that Louise married Arthur Hunkler in December, 1930, and the allegations are that after the marriage he became a tenant of the farm lands owned by Minnie Etta and paid her rental of one half the crop, that he and his wife resided in the Murdock home, and that they furnished Minnie Etta all the necessaries of life.

The evidence tends to show that at the time of the hearing the land was worth approximately $24,000, and that Minnie Etta owned some personal property at the time of her death of a value about $20,000.

A number of witnesses called by appellees related conversations they had with Minnie Etta pertaining to the

services appellees were rendering in the Murdock home and the contract they had with their aunt. Reference will be made first to the evidence of those witnesses who testified to having heard Minnie Etta speak of the contract she had with appellees. Mary Lindley testified that in 1920 and prior thereto, she was engaged in teaching and that in the school year 1919-1920, she was employed in the public schools at Lacon, Illinois. She stated that in August, 1920, pursuant to the request of Minnie Chambers, she called at the Murdock home in reference to her teaching the school at Hopedale, which Minnie Chambers had agreed to teach. She stated that the grandmother, Minnie Chambers and Louise were present and that Minnie Etta told her that Minnie had entered into a contract to teach a course in home economics at the Hopedale school for the coming year, that the salary was to be $1250 for the year, but that the duties and responsibilities in connection with the care of her mother and the other affairs of the home were such that she wanted Louise and Minnie to discontinue teaching and both remain at home and help with the work. She said that Minnie Etta told her that the school authorities at Hopedale had refused to release Minnie unless she procured someone to take her place and Minnie Etta asked witness to accept such school. The witness said that the discussions that day were lengthy and that Minnie Etta said several times during such discussion that if Minnie and Louise would give up their school work and stay at home and assist in caring for her mother and her as long as either one of them should live, that she, Minnie Etta, would will the two girls all the property she had. There was some repetition in the witness's testimony as to what Minnie Etta said, but the following is one instance and will serve to illustrate the others. She quotes Minnie Etta as saying: "If you will please go down and take this school so Minnie can stay with me, we have come to an agreement whereby the girls are to remain with me

as long as I live and at that time, the end, when I am through with this world, they are to receive as compensation everything that I possess." The witness testified that she and Minnie arranged to go to Hopedale and interview the school authorities and four days thereafter they made the trip which resulted in the board of education making a new contract with the witness and releasing Minnie from her contract. She further testified that when they returned to the Murdock home and told Minnie Etta of the success of their mission, Minnie Etta expressed her appreciation for the assistance the witness had rendered in taking the school and she again repeated that it meant so much to her and the girls and that the girls would be compensated by her will giving them all of her property. It appears from her testimony that during the school year, the witness made occasional calls at the Murdock home and at such times Minnie Etta again voiced her appreciation of what the witness had done and commented on the assistance the girls were to her and her mother and said the girls would receive all her property by will as compensation.

Edella Melville, who had known the Murdock family for many years and who had previously been engaged in teaching, testified to conversations she had with Minnie Etta in the summer of 1920. She said Louise was present on the first occasion and that Minnie Etta said that Louise had been re-employed to teach the Reed school the coming year at a salary of $100 per month. That Louise's help was badly needed in the home, and that she had persuaded her to give up her school and work at home. She quoted Minnie Etta as saying, "the girls [Louise and Minnie] don't need to get out and earn their living because all that I have will be theirs if they stay with me." She also related another conversation that occurred later in the summer of 1920, in which Minnie Etta told her that Minnie Chambers had been released from her contract at Hopedale and that she was going to work at home. The wit-

ness quotes her as saying: "These girls will stay with me and do as I want them to do. We have that agreement and when I am gone all that I have will be theirs in payment of their work here and I will put it in a will."

Augustus Risius, who was employed by Arthur Hunkler to do farm work and who lived in the home from January to October in 1940 and again in March and April, 1941, testified that in 1940 Minnie Etta told him that the girls gave up teaching to care for her and her mother, and she was giving them everything she had at her death. He testified to a second conversation which occurred in 1941 after her marriage to appellant, in which she said the agreement with the girls was still good even though she had been married, and that they were going to get the property as she had agreed.

Charles Maher, Jr., testified to a conversation in 1939 in which Minnie Etta referred to the agreement she had with the girls. He testified that she told him that the girls had quit teaching to care for her and her mother and that she was to will them all her property. He stated that on this and other occasions, she spoke approvingly of the work the girls were doing. On one occasion she mentioned the fact that the girls were expending their own money on the house, but she said that would be all right, for it would be theirs anyway.

Mary Groeper testified to conversations with Minnie Etta at various times during 1938 and 1939. She stated that Minnie Etta told her how the girls had given their lives to wait on her and her mother, that they had been faithful, that she had a contract with them whereby everything she had would be theirs at her death. She also stated that she had not paid the girls anything for their services, for whatever she had was to become theirs when she died.

Ten other witnesses called by appellees detailed conversations covering a period from 1933 to 1940. It would

extend this opinion to an unusual length to discuss each. It will suffice to say that the substance of the several conversations related by the witnesses all contained the same general topic, that is, that Minnie Etta said all of her property was to go to the girls at her death. Several of them testified as to what they had observed appellees doing in and about the home, all of which would appear to have been within the scope of the services they were to render under the contract.

Appellees testified in their own behalf. Appellant objected on the grounds they were incompetent. Section 2 of the Evidence Act (Ill. Rev. Stat. 1943, chap. 51, par. 2,) rendered them incompetent witnesses except as to such parts of their evidence as came within some one of the exceptions in section 2. (*Brownlie* v. *Brownlie,* 351 Ill. 72; *Simpson* v. *Wrate,* 337 Ill. 520.) Accordingly, all their evidence as to matters occurring with the deceased will be disregarded. However, their evidence concerning matters that occurred after the death of deceased was competent under the first exception in section 2 and will be commented upon later.

Appellant introduced in evidence a will made by Minnie Etta Murdock on August 1, 1938, but which, by virtue of section 46 of the Probate Act, (Ill. Rev. Stat. 1945, chap. 3, par. 197,) was revoked by her subsequent marriage. By it she disposed of her property on a basis entirely inconsistent with the contention that she was obligated by contract to will all her property to appellees. By its terms Louise was given all the household goods and personal effects and each was given a life estate in 40 acres of the farm land involved here, and a one-fourth of the residue which included only the personal property. The remainder in the two forties in which appellees were devised life estates, the remaining eighty acres and one half of the residue were devised to nieces, nephews, grandnieces and grandnephews, none of whom were her heirs-at-law. Thus,

the disposition of the property as made by the will was inconsistent with the thought that she should have complied with a contract by making a will that gave all the property to appellees. It was also in conflict with the statements she made to appellees' witnesses, Groeper, Risius, Frances Martin, Effie Martin and Charles Maher, Jr., which were to the effect that she had a will which gave the girls all her property and that she had made a will so the girls would have no trouble obtaining their compensation.

The fact that Minnie Etta Murdock executed a will, which, if it had been probated, would have disposed of her property in a way that was out of harmony and inconsistent with the oral contract would not, in itself, deprive appellees of the right to enforce the contract if they established its existence by clear and convincing proof and showed performance on their part. The will was a circumstance to be considered as bearing upon the improbability that she would have made such a will while under the obligations of a contract. See annotation and cases cited in 69 A.L.R. 210, and 106 A.L.R. 742.

The ninth clause of said will directed that if any beneficiary resisted the probate of the will or contested its validity or any of its terms, such beneficiary was to forfeit all benefits under the will. Appellant argues that such provision was indicative of an intent to revoke the contract and guard the estate against contest under the penalty of forfeiture. We do not know the purpose which prompted the insertion of such forfeiture clause, but it is reasonably certain that it could not be expected to apply to any beneficiary named in the will except appellees. They were the only ones among the beneficiaries who would take as heirs-at-law, so it is hardly conceivable that the testatrix thought any beneficiary who was not an heir-at-law and would take nothing except by the will would resist probate of the will, would contest its validity or object to its terms under the chance of forfeiting the benefits of the will.

Appellant contends the attitude of appellees in partici-
pating in the administration of the estate of Minnie Etta
Murdock Appel as intestate property, and their admissions
as contained in their sworn pleadings filed in this and an-
other partition action are so inconsistent with their present
claim as to discredit their good faith in prosecuting this
claim. The facts are that appellees joined in a petition for
the appointment of appellant and Mrs. Hunkler as admin-
istrators. Between the dates of May 7, 1942, the day
letters of administration were issued, and August 28, the
usual administration procedure of filing an inventory, fix-
ing of adjustment term, filing of an inheritance tax report
and having a tax fixed, was completed. All the steps thus
taken were on the basis that decedent had died intestate
and that all her property would pass to her heirs-at-law
under the statute of descent. Appellees each filed a claim
in the probate court against said estate for $14,000. Ap-
pellees joined with appellant in the filing of a complaint for
partition of the real estate and in the filing of an answer
in the instant suit. The allegations of the answer and
complaint were to the effect that decedent had died intes-
tate and the real estate was distributable to the heirs-at-law
under the statute of descent.

The admissions of fact as found in the probate proceed-
ings, the sworn answer and complaint were properly ad-
mitted in evidence as bearing upon the good faith of ap-
pellees in prosecuting their claim. Such admissions, how-
ever, are not in the same category as admissions of fact
contained in pleadings which form the basis of the action
or the defense to be interposed. Admissions of the latter
kind pertain to procedure and necessarily must be given
an effect different from an admission introduced as an
admission against interest. Section 35 (par. 159) of the
Civil Practice Act provides "Verified allegations shall not
constitute evidence except by way of admissions." It
refers to admissions of fact from a procedural standpoint.

The other class refers to admissions of fact found in the pleadings of another action such as the probate proceeding in this case. It also includes admissions of fact contained in pleadings which have been withdrawn, dismissed or superseded by an amended pleading such as the original answer filed by appellees and appellant, which was superseded by the filing of an amended answer and the complaint for partition filed by the same parties but which was later dismissed. Admissions of the latter class are admissible in evidence as admissions against interest. They are not conclusive against the party making them and may be explained or contradicted. (22 C.J. page 423. See annotations 14 A.L.R. p. 77; supplemented 90 A.L.R. 1409.) Distinction must be noted where admissions have been made in discarded pleadings which form the basis of estoppel. If the elements of estoppel are present, then the admissions are conclusive on the party making them. None of the elements essential to the application of the doctrine of estoppel are found in this case. The admissions of fact taken from the probate files, the sworn answer and complaint are of the class that makes them admissible as evidence subject to explanation and contradiction.

Appellees contend that the circumstances under which the admissions were made in the several pleadings were such that they explain away their probative force as evidence. They also refer to the fact that they were filed under the advice of counsel given at a time when appellant's attitude was that he was going to see that the property would go to appellees as intended by decedent.

The evidence shows that within a few days after the death of Minnie Etta Murdock Appel, appellant told appellees the will was in the Elmwood bank and suggested they interview an attorney. Soon thereafter, appellees consulted the attorney who had drafted the will and they told him of decedent's marriage. It does not appear that at that time appellees had any knowledge of the contents of

the will, nor does it appear that the attorney informed them of its provisions. He did tell them the marriage had revoked the will, and there was some discussion of the possibilities of a proceeding to annul the marriage. Appellees told the attorney that they understood that Minnie Etta Murdock had participated in the marriage ceremony against her will. No definite action was taken as to such litigation at that time. The attorney arranged with the officers of the bank to deliver the will to appellees. Immediately thereafter, appellees returned to the attorney's office with a sealed envelope which contained the will. Appellant accompanied them. After the contents of the will had been made known and the effect of the subsequent marriage on it had been discussed, administration of the estate was proposed. By mutual agreement, appellant and Mrs. Hunkler were appointed as coadministrators on May 7. In due course of administration, and within the time stated, the administration proceedings were carried on as detailed. Each administrator engaged his own lawyer but the lawyers co-operated in all the probate work. The same lawyers prepared appellees' and appellant's answer to the original complaint and filed the second complaint for partition.

There is a conflict in the evidence as to whether appellant on the day he and appellees were in the lawyer's office knew that appellees claimed they had an oral contract. Appellees both testified to facts which would indicate he knew of it. He denied any knowledge of their claim.

There is evidence, including appellant's which indicates that in the early stages of the administration proceedings appellant proposed to give appellees more than the share they would receive under the statute. The attorney testified that at the meeting in his office when the three were present, there were discussions by appellant to the effect that he wanted to help the girls. He testified: "I think he [Appel] told them that he would try to purchase the interest of some of the other heirs and try to work out

an arrangement whereby the girls would be given some advantage." He further testified that he advised appellees "to co-operate with Mr. Appel in trying to work out some satisfactory arrangement." Charles Maher, Sr., testified that after Mrs. Appel's death, apppellant stated to him that he wished to buy Mrs. Smith's and LeRoy Chambers' interests as he was going to give it to the girls; that his wife had wanted the girls to have it. Harold Shissler testified to a conversation with appellant in which appellant said that "He felt that it [the property] should stay in that [the Murdock] family; that he would do all he could to see that the property did stay where she originally intended it to."

It is conceded that soon after administration was started on the estate, a movement was initiated, joined in by appellant and appellees, to acquire the interest of Mrs. Smith and LeRoy Chambers. Appellant opened negotiations for the purchase of the Smith interest and he testified that appellees were to see their brother in reference to the purchase of his interest. Nothing came of these first negotiations. On June 13, Mrs. Smith and LeRoy Chambers filed this suit to partition the lands. Appellant and appellees, not being successful in acquiring the interest of Mrs. Smith and Chambers, joined in filing a second partition suit, not knowing that there was one pending.

In September, after the answer was filed to the original complaint on August 3, appellees engaged the counsel who appear for them on this appeal. On October 28, appellees moved to withdraw the answer filed August 3. From the time of employment of present counsel appellant and appellees ceased co-operating in the purchase of the Smith-Chambers interests. Appellant had proposed an exchange of tracts of land, and appellees testified that such proposal indicated to them that appellant was not intending to give them interests greater than provided by the statute of descent. Under such circumstances, they say, present coun-

sel was employed and after inquiry as to the facts he advised them they could establish a contract. On the other hand, appellant testified that he always intended to make a settlement with appellees, (he did not specify the terms,) but on October 20, he learned appellees had engaged other counsel and that they were going to contest his marriage and, he stated, prefer "a kidnapping charge" against him. He stated that the source of such information came from the attorney whom appellees had first employed. The attorney denied making such statement and we are satisfied that he did not. Immediately after October 20, appellant purchased the Smith-LeRoy Chambers interests. Deeds were executed conveying such interests to appellant on October 25 and 26. Appellees' counterclaim was filed November 20. The consideration appellant paid for such interests is not shown. The master found appellant issued an administrator's check for ·$2375, drawn on the estate checking account, and used it in making a payment on the interests.

The only evidence as to the contents of appellees' claims is that, pursuant to a rule of court requiring appellees to file a bill of particulars, they attached a copy of their pleading in this case. As already stated, it does not appear whether the claims were filed before or after the filing of appellees' counterclaim. It was held in *Fletcher* v. *Osborn,* 282 Ill. 143, that the filing of a claim against the estate of the deceased was not conclusive that no oral contract had been entered into. It was there stated that the filing of the claim was ·inconsistent with claimant's later contention but that the filing of the claim was justified as a cautionary measure in the event the claimant was not able to prove the contract. To the same effect is *Aldrich* v. *Aldrich,* 287 Ill. 213.

Courts of equity accept with caution evidence offered in support of a contract to make disposition of the property of a deceased person in a manner different from that

provided by law. (*Davier* v. *Kaiser*, 280 Ill. 334; *Woods* v. *Evans*, 113 Ill. 186.) But even under the test of scrutiny and skepticism which a court applies in this character of cases, we conclude that the master's finding that there was an oral contract and that appellees fully performed it is amply sustained by the evidence. The facts come within the rule announced in cases such as *Mayo* v. *Mayo*, 302 Ill. 584, and *Aldrich* v. *Aldrich*, 287 Ill. 213, where oral contracts were specifically enforced.

The facts surrounding appellant's purchase of the Smith-Chambers interests and his taking of $2375 from the estate funds to use as part payment of the same were at a time when he knew appellees were going to assert a claim for more than what would be their distributive shares as heirs-at-law. The master found he should account for such amount, and the decree so ordered.

The decree of the circuit court was correct and is affirmed.

*Decree affirmed.*