In re Estate of Michael McLaughlin, Deceased.—(Margaret Mc-Sheffrey, *et al.*, Plaintiffs-Appellees, *v.* Mary R. Baillie, *et al.*, Defendants-Appellants.)

(No. 55181;

First District—September 15, 1971.

Bernstein, Rochelle & Treshansky, of Chicago, (Howard Bernstein, and Ronald Butler, of counsel,) for appellees.

William A. Murphy and L. Louis Karton, of Chicago, for appellants.

Mr. JUSTICE BURMAN delivered the opinion of the court:

Michael McLaughlin died intestate on October 8, 1968. Letters of administration were issued, and a declaration of heirship was entered and later amended. On February 11, 1969, two nieces and two nephews of the decedent, Margaret McSheffrey, Mary R. Baillie, Richard McCole, and Vincent McLaughlin, instituted supplemental proceedings in the probate division of the circuit court to enforce the terms of an alleged oral contract. The cause proceeded to trial; and the court, after hearing testimony and arguments of counsel, entered an order which in substance granted the relief sought by the plaintiffs in their complaint.

From this order, four heirs-at-law appeal and contend (1) that the judgment is against the manifest weight of the evidence and (2) that the judgment is contrary to law.

Due to the nature of the contentions raised, it is necessary to set forth the evidence presented at trial. Charles McCole, a nephew of the decedent and a brother of one of the parties to the alleged oral contract, testified that in September, 1968, he visited and conversed with his uncle who was in the hospital. During this conversation, his uncle stated that he was not really lonely in the hospital because the four plaintiffs herein, frequently visited, wrote or telephoned him. The decedent further said to him, "Charlie, these four people [the plaintiffs] has been very good to me and kind to me, and as I told you before that I am not going to forget these four in my will."

The reference to "before" was to a conversation which the witness had with his uncle on Thanksgiving Day in 1966. At that time the decedent acknowledged the kindness and attention which the plaintiffs had given him: Richard McCole had done carpentry work for him; Vincent McLaughlin had visited with him and driven him to a number of places; Mary Rose Baillie had done household work and cared for personal business for him; and Margaret McSheffrey had entertained him nicely when he visited Boston. The witness then testified with regard to this conversation, "And he said, 'If they continue to show me good times—' and one thing and another, 'that I will not forget them in my will. I want to leave them each $10,000 a piece, which should be a good start,' or something to that effect to help them out."

Charles McCole further testified that in the period from 1965 to 1968 he had seen his brother, Richard, with his deceased uncle about 25 or 30 times. During this time he observed his brother doing repair or carpentry work in the decedent's place of business. He often saw the decedent with Vincent McLaughlin, and in March, 1968, he saw the two of them just after Vincent had driven the decedent to visit a cemetery.

Bernard Toland, who had known the decedent as a friend since 1946,

and who visited with him five or six times a year, testified with regard to a conversation which he had with the decedent on July 4, 1966, as follows:

"He said Mary Rose was so good to him she cleans his house from top to bottom, washes curtains, drapes, irons them up and makes his supper for him. "Vincent is like a chauffeur to me, he brings me to the beach, ballgames, and he brings me to Wisconsin to Dick's home," anywhere he wants to go. Vincent is available.

\* \* \*

He said he regretted that Margaret was so far away. "I feel so close to her, she invites me to come to Boston to her home, and when I do go there, she shows me a great time."

\* \* \*

He said, "Dick, he does work for me in the tavern. He panelled the walls, tends bar, and he won't take any money for it."

\* \* \*

He said to me, "His being so kind to me in the past, and if they continue to in the future, I intend to leave them 10 to $13,000 in my will when I die."

Toland further testified that on Christmas Day, 1967, the decedent, after recounting the activities of the plaintiffs, stated, "those four I have mentioned he said being so good to me, I plan to leave 10 to $15,000 in my will."

George Doherty testified that he had known the deceased since their childhood days in Ireland. He was present at Bernard Toland's home on July 4, 1966, and overheard the decedent discussing the making of a will.

James A. Mahoney, an attorney who had known the decedent for a number of years, testified that on October 6, 1968, he drafted and prepared a will in accordance with instructions given by McLaughlin. This will was never signed because the decedent died three days before the date scheduled for the document's execution.

It was brought out on cross-examination that prior to October 6, 1968, Mahoney had prepared two rough drafts of the will. The first draft was drawn up in September, 1968, but was revised after a conference with McLaughlin on September 27, 1968. At this meeting the decedent set forth and reviewed the basic testamentary scheme which was adopted in the final draft, and at this time he noted specifically that he had forgotten about Margaret McSheffrey's having been so good to him when he visited Boston and about her having eight or nine children. The second draft was prepared after the conference and was presented to the decendant on October 6, 1968. On the same day, but after the presenta-

tion of the second draft, the final draft was drawn up in accordance with instructions.

The unexecuted will was admitted into evidence over objection. In it, the decedent bequeathed $6,500.00 to friends and to charity and $6,000.00 plus one tenth of the residue of the estate to each of ten named persons, including five brothers and sisters, the daughter of a deceased brother, and the four nieces and nephews who are plaintiffs herein. No evidence was introduced by the defendants.

The court found that the plaintiffs had sustained their burden of establishing the existence of an oral contract to make a will and ordered the administratrix of the estate to pay to each of the four $6,000.00 plus one-tenth of the net estate after payment of claims and the costs of administration.

■■  The rules and guidelines which must be followed by a trial court in determining whether it is proper to grant specific performance of an oral contract to make a will, have been set forth in numerous cases. (See: *Linder v. Potier*, 409 Ill. 407, 100 N.E.2d 602; *Yager v. Lyon*, 337 Ill. 271, 169 N.E. 222.) In controversies of this type, the court must scrutinize the evidence presented (*Chambers v. Appel*, 392 Ill. 294, 64 N.E.2d 511), and it should enforce the alleged contract and order a distribution of the decedent's estate different from that set forth in a validly executed will or required by the laws of descent only after the contract's existence and terms have been proved by clear, explicit, and convincing evidence which leaves no reasonable doubt (1) that the contract was made or (2) that there was a meeting of the minds as to all of its terms. *Galapeaux v. Orviller*, 4 Ill.2d 422, 124 N.E.2d 321; *Hickey v. Hickey*, 374 Ill. 164, 30 N.E.2d 423; *Anderson v. Augustana College*, 300 Ill. 72, 132 N.E. 826.

■■■  A claimant may prove the making of a contract and its terms circumstantially through evidence of the actions and statements of the parties (*Hickey v. Hickey*, 374 Ill. 614, 30 N.E.2d 423); however, testimony that the decedent made declarations of testamentary intent is not sufficient in itself to establish the existence of an enforceable oral contract. *Greenwood v. Commercial National Bank of Peoria*, 7 Ill.2d 436, 130 N.E.2d 753; *Wrestler v. Tippy*, 280 Ill. 124, 117 N.E. 404.

In the instant case, the evidence shows that the decedent, on a number of occasions, expressed a desire to bequeath various sums of money to the plaintiffs. On July 4, 1966, he told his friend, Bernard Toland, "* * * If they [the plaintiffs] continue to in the future [to be kind to me] I intend to leave them 10 to $13,000 in my will when I die." On Thanksgiving Day 1966, he stated to his nephew, Charles McCole, "If they continue to show me good times that I will not forget them in my will. I want to leave them

each $10,000 a piece, which should be a good start." On Christmas Day, 1967, he said to Bernard Toland, "* * * Those four I have mentioned, he said being so good to me, I plan to leave 10 to $15,000 in my will." In September, 1968, he informed Charles McCole, "* * * I am not going to forget these four in my will." In addition, shortly before his death the decedent instructed his attorney to draw up a will which, if executed, would have bequeathed $6,000.00 plus one-tenth of the residue of the estate to each of the plaintiffs.

■■ This evidence, as a matter of law, was insufficient to clearly and convincingly prove the existence and terms of the alleged contract. The decedent's conversations with McCole and Toland reveal that he was grateful for all that the plaintiffs had done for him; however, there is no indication in any of his statements or in the unexecuted will that he was acting under a binding contractual duty when he planned and intended to leave property to the plaintiffs. His statements and the unsigned will amount to nothing more than declarations of testamentary intent.

The evidence with regard to the terms of the alleged contract is at best uncertain. Each time that the decedent expressed an intention of making a bequest to the plaintiffs, the amount of the bequest was different. At one point he spoke of leaving $10,000.00 to $13,000.00, at another point of leaving $10,000.00, at still another of leaving $10,000.00 to $15,000.00. In the unexecuted will he sought to bequeath to each of the plaintiffs $6,000.00 plus one-tenth of the residue of the estate. Moreover, although it is uncontroverted that each of the plaintiffs provided services to the decedent, there is no evidence of an agreement for the plaintiffs to render any specified services. The decedent never mentioned in his conversations any duties or obligations which had been imposed on the plaintiffs, and when he spoke of the future, he said only that he planned to leave the plaintiffs property "[i]f they continued to show me good times."

The plaintiffs argue that the unsigned will corroborates the other testimony relating to the making of the oral contract and that the decedent's statements when coupled with the plaintiffs' actions are sufficient to justify enforcement of the agreement. They cite a number of cases in support of their argument, but in each of the cases where the court held that the evidence was sufficient to establish the existence and terms of the oral contract, the proof was much more extensive than in the present case. In *Wessel v. Eilenberger*, 2 Ill.2d 522, 119 N.E.2d 207, the decedent's secretary, Flora May Wessel, alleged that she gave up plans to move to Alabama, that she moved from her home to the decedent's farm, and that she cared for the decedent, Edmund J. Stafford, in exchange for Stafford's promise to bequeath to her his farm and all the personal

property thereon. The evidence showed that in 1938 Miss Wessel moved to the farm, that she cared for Stafford who was in poor health, and that she assisted him in the conduct of his business until his death in 1947. She received wages, but her salary was not commensurate with the services provided. Three witnesses specifically testified that Stafford acknowledged to them the existencet of the agreement and its terms, and others testified to the extent of the services rendered. The court held that the acts of the parties and the statements of the decedent were sufficient to establish the making of the contract.

In *In re Estate of Niehaus*, 341 Ill.App. 454, 94 N.E.2d 525, Mary Lucas, a niece of the decedent's deceased wife, alleged that William F. Niehaus promised to leave his entire estate to her on the condition that she remain in his home and care for him until his death. The evidence showed that she had lived with her uncle for more than twenty-five years and that she had cared for him until his death in 1947. In 1941 she had planned to marry, but the marriage was postponed at her uncle's request until after World War II. Three witnesses testified that Niehaus had spoken to them about the alleged agreement and its terms. The Court held that the acts of the parties and the statements of the decedent constituted sufficient evidence to justify the trial court in finding that the essential terms of the contract had been clearly esablished.

In *Jatcko v. Hoppe*, 7 Ill.2d 479, 131 N.E.2d 84, the evidence showed that Cecelia Hoppe and her husband moved into Cecelia's mother's home in 1938. The Hoopes allegedly relied upon a promise made by Cecelia's mother, Elizabeth Tomso, that she would devise the home to them, and they made significant improvements to the house with their own funds. In 1942, after the first renovations were completed, Mrs. Tomso executed a will in which she devised the house to Cecelia. The Hoppes continued to improve the property for a period of fifteen years; and as the improvements were finished, Mrs. Tomso stated to a number of her friends and relatives that she had given the property to Cecelia. Shortly before her death, Mrs. Tomso revoked the 1942 Will and bequeathed all of her property equally to her five daughters. After Mrs. Tomso's death, the daughters instituted partition proceedings, and the Hoppes counterclaimed for specific performance of the alleged oral contract. The court held that the totality of the circumstances—the actual execution of the Will after the completion of major renovation, the continued improvement of the property, and Mrs. Tomso's statements to neighbors and friends—provided substantial basis for the conclusion that the Hoppes and Mrs. Tomso had entered a valid and enforceable contract.

In *Holmes v. Ackley*, 400 Ill. 372, 81 N.E.2d 178, Naomi Holmes sought

to enforce an oral agreement under which her step-grandmother, Mae Bourgois, was allegedly obligated to devise certain real property to her. The evidence presented in support of the alleged agreement showed that Naomi had moved into her step-grandmother's home and that she performed considerable service for her step-grandmother in the last months of her life. Naomi's father testified that Mrs. Bourgois said to him, "I want her to come and stay with me the rest of my life, and I will give her my home." Another witness who was one of Naomi's friends testified to the same effect. Dorothy Spomer, Mrs. Bourgois' attorney, testified that her client in giving instructions for the drafting of a will said on the day before her death, "I want to leave my home to the girl [Naomi Holmes]." The court noted that the testimony of Mrs. Bourgois' attorney corroborated other evidence concerning the making and performance of the agreement and held that the activities of the parties and the statements of the decedent were sufficient to establish the existence and terms of the contract.

■■ In the instant case, there is no evidence that McLaughlin made promises to leave specific property to the plaintiffs in exchange for the rendition of specified services. His conversations with McCole and Toland in contrast to the statements by Stafford in *Wessel,* by Mary Lucas' uncle in *Niehaus,* by Elizabeth Tomso in *Jatcko,* and by Mae Bourgois in *Holmes* at most showed he had formed an intent to will property to the plaintiffs if they continued to be good to him. Mere declarations of intent based on affection are not in themselves sufficient to establish the existence of an enforceable contract to make a will. *Greenwood v. Commercial National Bank of Peoria,* 7 Ill.2d 436, 130 N.E.2d 753; *Wrestler v. Tippy,* 280 Ill. 124, 117 N.E. 404.

For the reasons set forth above, the judgment of the probate division of the circuit court is reversed.

Judgment reversed.

ADESKO, P. J., and DIERINGER, J., concur.