*In re* ESTATE OF LAMBERT J. POMEROY, Deceased—(ROSE KIRK, Claimant-Appellant, *v.* ESTATE OF LAMBERT J. POMEROY, Respondent-Appellee.)

(No. 59105;

First District (3rd Division)—August 1, 1974.

Marvin L. Herman and Burton F. Natarus, both of Chicago (Levin & Berger, of counsel), for appellant.

John L. Flynn and Emmett J. Galvin, both of Chicago, for appellee.

Mr. PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Claimant, Rose Kirk, appeals from an order of the circuit court of Cook County dismissing her claim against the estate of Lambert J. Pomeroy. On January 13, 1972, claimant filed the claim seeking to recover payment for services performed for the decedent. The claimant was employed by the decedent as a housekeeper from October 1966 until his death in April 1971. In addition to room and board, the claimant was paid a weekly salary of $85.00. The salary was subsequently raised to $100 per week. A hearing without a jury was held on the claim. At the close of claimant's case, the respondent moved under section 64(5) of the Civil Practice Act to dismiss the claim, and the trial court granted respondent's motion.

The claim, after claimant abandoned one count, alleged two alternative theories of recovery. One count was that the claimant had an express contract with the decedent whereby, in consideration of services to be performed by her, he agreed to direct his son to purchase a $50,000 certificate of deposit for her. The other count charged that claimant performed services for decedent in consideration of his implied promises to pay her the reasonable value thereof.

Randolph Pomeroy, decedent's son, was called as an adverse witness under section 60 of the Civil Practice Act. He testified that 11 days before decedent died, the decedent said that he wanted to give the claimant $25,000 or $50,000 and instructed him to buy the claimant a $50,000 certificate of deposit after his death. The witness told decedent he would do so, but did not comply.

The claimant testified that on the date of decedent's death Randolph told her that he would do what his father said, and that she should not worry. The claimant told the son that when decedent's estate was settled, he should purchase the $50,000 certificate of deposit in her daughter's name. About 4 weeks later, the claimant repeated the request to the son,

who then told her not to hold her breath as everything had been left in trust to his mother.

Louise Bates, a friend of the claimant, testified that claimant bathed the decedent, cooked for him, fed him, and did the shopping. According to the witness, the claimant worked around the clock, attentive to the decedent's requests. As a result, the claimant and the decedent developed a very close relationship. The decedent told Louise Bates that he was unable to employ another housekeeper for less than $38.00 a day. Because he was unwilling to pay that much, he said he was going to leave the claimant a certificate of deposit. He would not leave it in his will because its value would be reduced by taxes. He told another person in the presence of the witness that he would see that claimant was taken care of for life. Louise Bates also testified that decedent said his son would comply with his instructions in purchasing a certificate of deposit for claimant.

Over respondent's objection, Robert Wolf testified as an expert witness. He was employed as a field inspector for the State of Illinois, Department of Labor, Division of Private Employment Agencies, which regulates nurses' registries and domestic employment agencies. In his opinion a woman performing similar services as claimant would earn $300 to $350 per week at prevailing rates. On cross-examination, he testified that he had never worked for an employment agency, and that his testimony was not based upon any research conducted by him.

Ramona Schultz, a bank vice-president, testified that the decedent telephoned the bank in 1970 for information relative to the bank's interest rates. After a personal meeting, the decedent purchased a $100,000 certificate of deposit. Decedent thereafter requested the witness to type some checks for him, and she, for 5 dollars a visit, performed the task each Wednesday afternoon until decedent's death. Each week the witness typed a check to the claimant for $100.00. When she remarked that decedent should be deducting social security, the decedent stated that the claimant would not need social security because he intended to take care of her. (It appears undisputed that after decedent's death the respondent estate filed social security returns on claimant's behalf and paid both decedent's and claimant's shares, the latter figure amounting to $1032.33.)

Decedent once asked Ramona Schultz' opinion as to the advisability of placing a $50,000 certificate of deposit in the claimant's name. The witness advised him to indicate such an intent in his will, but the decedent responded that the government would take most of it. He then told the witness that he had instructed his son to purchase a C.D., and he was sure his son would do it.

Ramona Schultz further testified that on Christmas 1970 the decedent and claimant were her guests for dinner. Decedent, in the presence of claimant, told the witness that he would see to it that the claimant would never want. The witness urged decedent to reduce his intention to writing. Decedent then said to claimant that if she would stay with him, she would not have a thing to worry about. The claimant replied that decedent knew she would never leave him. In February 1971, Ramona Schultz again told decedent that if he wanted to leave claimant anything, he "should make it legal." Decedent replied that he wanted claimant to have a $50,000 C.D., but repeated his fear of the government getting too much from him.

Cleveland Boyd, decedent's yard man and chauffeur, testified that decedent stated that he wanted the claimant to have a $50,000 C.D. after his death. Decedent also told Boyd that he would leave word with his son to carry out his wishes.

Betty Schofield, a neighbor, testified that she observed the decedent and claimant about once a week. The claimant took good care of decedent especially in preparing and serving his meals. In 1967, the decedent told the witness that he was going to take care of the claimant so that she would not have to work again for anyone. In 1970 or 1971, decedent told Betty Schofield that the claimant would receive a $50,000 C.D. after his death. When the witness suggested a provision in his will, the decedent mentioned tax problems and said that he had instructed his son to take care of it.

■■■ In cases tried without a jury, the trial judge, in deciding defendant's motion for judgment at the close of plaintiff's case, shall pass on the credibility of witnesses and consider the weight and quality of the evidence. (*M.F.M. Corp. v. Cullerton* (1973), 16 Ill.App.3d 681, 306 N.E.2d 505; *Allfree v. Estate of Rosenthal* (1969), 113 Ill.App.2d 90, 251 N.E.2d 792.) On appeal, in such cases, the sole issue becomes whether the trial court's decision is contrary to the manifest weight of evidence. (*De Bello v. Checker Taxi Co.* (1972), 8 Ill.App.3d 401, 290 N.E.2d 367.) When sitting without a jury in such cases, a trial court must not consider the evidence in a light most favorable to plaintiff, but must weigh the evidence including any evidence favorable to defendant. *Hawthorn Mellody Farms Dairy, Inc. v. Rosenberg* (1973), 11 Ill.App.3d 739, 297 N.E.2d 649.

■■ Claims against an estate shall not be permitted to prevail except upon clear and convincing proof, and the evidence pertaining thereto must be carefully scrutinized. (*In re Estate of Heyder* (1965), 62 Ill.App.2d 318, 210 N.E.2d 619.) An express contract may be proved by an actual agreement, by the express words used by the parties, and also

by circumstantial evidence. (*Rush v. Estate of Rush* (1960), 27 Ill.App.2d 242, 169 N.E.2d 538.) A court should enforce an alleged contract and order a distribution of the decedent's estate different from that set forth in a validly executed will only after the contract's existence and terms have been proved by clear, explicit and convincing evidence which leaves no reasonable doubt that (1) the contract was made; and (2) that there was a meeting of the minds as to all its terms. *In re Estate of McLaughlin* (1971), 1 Ill.App.3d 940, 274 N.E.2d 618.

■■ Under the foregoing criteria, the order of the trial court dismissing the claim was not contrary to the manifest weight of the evidence. The record does not disclose the clear and convincing testimony necessary to establish the existence of an express contract. Indeed, there appears to be no evidence of a meeting of the minds between the decedent and claimant resulting in a direct, positive agreement, other than for the wages and benefits actually received by claimant. Several witnesses testified as to having conversations with the decedent in which he stated that the claimant would be taken care of for life, and that she would never want for anything. The witnesses also testified that decedent told them that he wished to have his son purchase a $50,000 certificate of deposit for claimant after his death. Decedent's son corroborated this testimony. However, that evidence was insufficient to establish the existence and terms of a contract between the claimant and the decedent. The strongest testimony favorable to the existence of a contract came from Ramona Schultz and concerned the conversation she had with decedent after Christmas dinner in 1970. At that time, decedent stated that if the claimant would stay with him, she would not have a thing to worry about. The claimant then stated that decedent knew she would never leave him. The trial court properly found that such a conversation did not establish a contract. The evidence must establish a definite contract based upon a consideration that claimant performed referable to that contract and to which decedent considered himself bound. The present claim appears to be based upon a unilateral expression of a future desire or intent of the decedent, uncompleted at the time of his death, and without mutuality on the part of the claimant. (*Greenwood v. Commercial National Bank of Peoria* (1955), 7 Ill.2d 436, 130 N.E.2d 753; *In re Estate of Heyder* (1965), 62 Ill.App.2d 318, 210 N.E.2d 619.) We believe it significant that there was no change in claimant's position either before or after the Christmas conversation. (See *Stephens v. Collison* (1924), 313 Ill. 365, 145 N.E. 81; *In re Estate of Niehaus* (1950), 341 Ill.App. 454, 94 N.E.2d 525.) We also observe that the decedent continually spurned advice to get legal counsel and to place his expression

of future intention as to claimant in his will. Claimant's claim conceded that she was paid $85.00 to $100.00 per week plus room and board throughout her several years of employment by the decedent. Decedent's statements to the various witnesses amounted to nothing more than declarations of testamentary intent, and the evidence did not establish the existence and terms of any other contract between the parties.

Cases cited by claimant in support of her argument are clearly distinguishable from the instant case. In *Willis v. Zorger* (1913), 258 Ill. 574, 101 N.E. 963, there was clear and convincing evidence of an oral contract between a bachelor decedent and his claimant nephew to convey a farm to the latter, who had worked the farm for 40 years. In *Wessel v. Eilenberger* (1954), 2 Ill.2d 522, 119 N.E.2d 207, the court had evidence that the decedent expressly acknowledged the existence of an express contract to convey a farm to the plaintiff, and that the plaintiff had changed her position by moving to the farm. Likewise, in *Jatcko v. Hoppe* (1955), 7 Ill.2d 479, 131 N.E.2d 84, the evidence revealed the existence of an oral contract to convey real property to plaintiffs, who had moved on to the property and made improvements.

Claimant's second contention is that the trial court erred in not considering or allowing her claim, pursuant to her alternative theory of recovery, for the reasonable value of services under an implied contract. It appears that claimant proceeded at trial solely on her theory of an the trial court did not err in not allowing claimant the value of her services pursuant to an implied contract.

Where no family relationship exists between the parties, and one accepts and retains another's services, which were rendered at his request and which he had no reason to suppose were gratuitous, the law will imply a contract for such services in such an amount as they are reasonably worth. (*Floyd v. Estate of Smith* (1943), 320 Ill.App. 171, 50 N.E.2d 254; *In re Estate of Mallas* (1968), 100 Ill.App.2d 88, 241 N.E.2d 482.) In the present case, the services were not rendered gratuitously. Claimant was employed by decedent at a weekly salary of $85.00 per week, plus room and board. Sometime during the employment, the salary was increased to $100.00 per week. Since an express contract existed between the parties for the value of claimant's services, we are unable to rewrite that contract to fix additional compensation for her. Although claimant suggests in this argument that there was no proof that she was paid the weekly salary, both the pleadings and the evidence reveal otherwise. The claim itself alleged that she was paid approximately $85.00 to $100.00 per week plus room and board. Ramona Schultz testified

that claimant was paid $100.00 per week, and Louise Bates testified that she saw the claimant cash several checks.

For the reasons stated, the order of the circuit court of Cook County dismissing claimant's claim is affirmed.

Order affirmed.

DEMPSEY and MEJDA, JJ., concur.